STATE of Minnesota, Respondent,

v.

John Joseph BUSSMANN, Appellant.

No. A05–1782.

Supreme Court of Minnesota.

Nov. 1, 2007.

Rehearing Denied Nov. 28, 2007.

Lori Swanson, Minnesota Attorney General, Saint Paul, MN, and Michael O. Freeman, Thomas A. Weist, Hennepin County Attorneys, Minneapolis, MN, for Respondent.

John. G. Westrick, Kirk M. Anderson, Saint Paul, MN, for Appellant.

## OPINION

HANSON, Justice.

Appellant John Joseph Bussmann was convicted of two counts of third-degree criminal sexual conduct by a member of the clergy, in violation of Minn.Stat. § 609.344, subd. 1(*l*)(ii) (2006) (hereafter the "clergy sexual conduct statute"). The clergy sexual conduct statute makes it a crime for a member of the clergy to engage in sexual penetration with a person who is seeking or receiving "religious or spiritual advice, aid, or comfort in private." Bussmann argues that the clergy sexual conduct statute is unconstitutional because it is void for vagueness and it violates the Establishment Clause of the United States and Minnesota Constitutions. Because we (1) conclude that the clergy sexual conduct statute is not void for vagueness; (2) are equally divided on whether the statute facially violates the Establishment Clause; but (3) conclude that Bussmann's conviction, based on the admission of extensive evidence concerning religious doctrine and church policies and practices, violated the Establishment Clause, we affirm the court of appeals' decision on the first two issues, reverse the court of appeals' decision on the third issue, and remand for a new trial.

Bussmann served as a Catholic priest at two churches, Saint Martin's in Rogers, Minnesota and Saint Walburga in Fletcher, Minnesota (the two churches were later consolidated into one, Mary Queen of Peace Church). While serving those churches, Bussmann began sexual relationships with two adult female parishioners, S.J. and D.I. Bussmann's sexual relationship with S.J. began in September 2002 and included sexual contact and penetration. Before and during their sexual relationship, Bussmann advised S.J. on religious and marital issues. Their relationship lasted until March 2003, when S.J. reported her relationship with Bussmann to the Archdiocese of Saint Paul and Minneapolis. Later, S.J. contacted the police.

In November 2002, Bussmann also began a sexual relationship with D.I., who he had been counseling through the grief resulting from her mother's death. Their relationship also involved sexual contact and penetration. On March 18, 2004,

based on S.J.'s report to police, Bussmann was charged with third-degree criminal sexual conduct involving S.J. After learning of those charges, D.I. told her husband about her relationship with Bussmann and eventually reported the full extent of her sexual relationship with Bussmann to police.

The complaint against Bussmann was amended several times and eventually charged him with two counts of third-degree criminal sexual conduct based on his relationships with S.J. and D.I. Both charges were tried together. At trial, the state's first two witnesses were officials of the Archdiocese who testified extensively about the Catholic Church's practices and doctrines, including the religious basis for a priest's power in relationship to parishioners; the Church's definition of inappropriate counseling and pastoral care; the Church's concerns with the growing number of complaints of sexual misconduct by priests with adult parishioners; the procedures followed by the Church under canon law to investigate, prosecute, and adjudicate violations of the Church's rules regarding priestly behavior and priestly celibacy; and the Church's investigation of Bussmann, which led to the Decree of the Archdiocese that Bussmann had likely "engaged in behavior violative of his priestly authority and of his priestly celibacy."

D.I. and S.J. testified about their relationships with Bussmann. Bussmann's attorney stipulated to Bussmann's involvement with the two women, but argued that his relationships did not meet the prerequisites of the clergy sexual conduct statute.

Bussmann was convicted of both counts, sentenced to concurrent terms of imprisonment of 48 months and 68 months, and ordered to pay $2,500 in restitution. The court of appeals rejected Bussmann's claims that the clergy sexual conduct statute is void for vagueness or that it violates the Establishment Clause of the United States and Minnesota Constitutions. *State v. Bussmann*, No. A05–1782, 2006 WL 2673294, at *5 (Minn.App. Sept.19, 2006). As to the Establishment Clause claim, the court of appeals relied on its previous decision, that the clergy sexual conduct statute did not foster "excessive governmental entanglement with religion," in *Doe v. F.P.*, 667 N.W.2d 493, 500 (Minn.App.2003), *rev. denied* (Minn. Oct. 21, 2003). *Bussmann*, 2006 WL 2673294, at *5. In *F.P.*, the court of appeals concluded that the requirement that a court determine whether the "advice, aid, or comfort" provided by a member of the clergy in private was "religious or spiritual" did not foster excessive government entanglement with religion. 667 N.W.2d at 500. We granted review on the constitutional challenges to the statute.

■■■ "Minnesota statutes are presumed to be constitutional, and our power to declare a statute unconstitutional should be exercised with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). Constitutional challenges are questions of law, which we review de novo. *In re Blilie*, 494 N.W.2d 877, 881 (Minn.1993).

## I.

Bussmann argues that the clergy sexual conduct statute is unduly vague, in violation of due process. The relevant portions of the statute provide:

[A] person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the third degree if any of the following circumstances exists:

* * * *

(*l*) the actor is or purports to be a member of the clergy, the complainant is not married to the actor, and:

* * * *

(ii) the sexual penetration occurred during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private.

Minn.Stat. § 609.344, subd. 1(*l*)(ii) (2006).

■■■ The void-for-vagueness doctrine requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Bussmann argues that the clergy sexual conduct statute fails to give fair warning of what conduct is prohibited. Bussmann does not claim that the clergy provision is vague as applied to him, only that it might not give fair warning in other situations. But "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " *Hill v. Colorado,* 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting *United States v. Raines,* 362 U.S. 17, 23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)).

■■■ Bussmann next argues that the terms "ongoing" and "religious or spiritual advice, aid, or comfort" leave jurors free to decide what conduct is prohibited. In *Giaccio v. Pennsylvania,* the Supreme Court stated that a law fails to meet due process requirements if it "leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." 382 U.S. 399, 402–03, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). But due process requirements are satisfied "by specifying standards of conduct in terms that have acquired meaning involving reasonably definite standards either according to the common law or by long and general usage." *State v. Bolsinger,* 221 Minn. 154, 167, 21 N.W.2d 480, 489 (1946).

The term "ongoing" has a reasonably definite meaning in common usage, generally understood to be synonymous with the term "continuing."[1] In the context of the clergy sexual conduct statute, "ongoing" simply means that the clergy-counselee relationship that was established at a meeting continued for the period specified in the complaint. Whether a clergy-counselee relationship was established, whether an established clergy-counselee relationship actually continued, and whether the proscribed sexual conduct occurred during that ongoing clergy-counselee relationship are factual matters for the jury to decide and do not present vagueness concerns.

■■■ The term "religious or spiritual advice, aid, or comfort" has acquired a reasonably definite meaning from the use of the same term in the evidentiary clergy privilege statute. Minn.Stat. § 595.02, subd. 1(c) (2006) (stating that a member of the clergy shall not "be examined as to any communication made to the member of the clergy or other minister by any person seeking religious or spiritual advice, aid, or comfort * * * without the consent of the person"). We have said that the term applies to requests for religious or spiritual aid that are made to clergy in their professional capacity. *E.g., State v. Black,* 291 N.W.2d 208, 216 (Minn.1980) (holding that request from inmate to county jail chaplain to pass information to co-conspir-

---

1. *E.g., United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (discussing application of a *Terry* stop in the context of ongoing crimes and completed crimes); *Kilcoyne v. State,* 344 N.W.2d 394, 397 (Minn.1984) (discussing ongoing sexual exploitation that continued for a period of time).

ator was not privileged because the aid requested was not religious and because the request was not intended to be confidential). We have also noted that the "wording of the statute indicates that 'religious or spiritual' modifies 'advice, aid, or comfort,' not just 'advice.'" *Id.; see also Christensen v. Pestorious*, 189 Minn. 548, 552, 250 N.W. 363, 365 (1933) (stating that "[w]hile the pastor called upon the witness at the hospital prepared to give spiritual advice or comfort if the occasion required, it is beyond genuine controversy that none was asked").[2]

Because the terms "ongoing" and "religious or spiritual advice, aid, or comfort" have acquired reasonably definite meanings, those terms provide a sufficiently fixed legal standard to determine what is prohibited. Accordingly, the clergy sexual conduct standard is not unduly vague and does not violate due process.

## II.

We turn next to Bussmann's argument that the clergy sexual conduct statute fa-

cially violates the Establishment Clause. We are equally divided on this issue, but will discuss the two opposing views on facial invalidity.

### A. The view that the statute facially violates the Establishment Clause.

The author of this opinion concludes that the clergy sexual conduct statute facially violates the Establishment Clause and should be stricken as unconstitutional. The discussion supporting this view is contained in this part A.

To begin the analysis of this issue, it is helpful to place the clergy sexual conduct statute in the context of the variety of third-degree criminal sexual conduct crimes described in Minn.Stat. § 609.344 (2006). That section criminalizes sexual penetration that occurs in various defined situations and, most significantly, removes consent as a defense to that penetration in many situations.[3]

---

**2.** Bussmann also claims the clergy provision is overbroad, but he does not identify a constitutional defect. "[T]he overbreadth doctrine departs from traditional rules of standing to permit, in the First Amendment area, a challenge to a statute both on its face and as applied to the defendant." *State v. Machholz*, 574 N.W.2d 415, 419 (Minn.1998) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Members of the clergy have neither a First Amendment nor a liberty interest in sexual activity gained through exploitation of the clergy-counselee relationship. *See, e.g., Reynolds v. United States*, 98 U.S. 145, 166–67, 25 L.Ed. 244 (1878) (holding that statute which prohibited polygamy did not violate First Amendment); *Talbert v. State*, No. CR 05–1279, 367 Ark. 262, —— S.W.3d ——, 2006 WL 2699903, at *4 (Sept. 21, 2006) (holding that member of clergy had no liberty interest to engage in sexual activity through abuse of his position of trust and authority).

**3.** Under Minn.Stat. § 609.344, consent is expressly eliminated as a defense where the complainant is under 13 years of age (subd. 1(a)); the complainant is between 13 and 16 years of age and the actor is more than 24 months older (subd. 1(b)); the complainant is between 16 and 18 years of age and the actor is more than 48 months older and in a position of authority (subd. 1(e)); the complainant is between 16 and 18 years of age and the actor has a significant relationship to the complainant (subd. 1(f) and (g)); the actor is a psychotherapist and sexual penetration with a patient occurred during a psychotherapy session or while an ongoing psychotherapist-patient relationship existed (subd. 1(h)); the actor is a psychotherapist, the complainant is or was a patient, and sexual penetration occurred by means of therapeutic deception (subd. 1(j)); the actor accomplishes sexual penetration by means of deception that the penetration is for a bona fide medical purpose (subd. 1(k)); the actor is a corrections worker

In this latter respect, section 609.344 is at odds with the general notion in criminal law that consenting adults have a protected right to engage in sexual contact. The United States Supreme Court has held that a state may not generally criminalize sexual contact between consenting adults in the privacy of their home. *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (holding that private sexual contact between consenting adults is a liberty right protected by the Due Process Clause of the Fourteenth Amendment). The Court implied that this general rule may not apply in cases where the consent is not legally effective, mentioning cases involving "minors," "persons who might be injured or coerced," or persons who are "situated in relationships where consent might not easily be refused." *See id.*

Before 1993, one exception created by the legislature, where a person's consent was not a defense to a sexual conduct crime, was in the psychotherapist-patient relationship. Minn.Stat. § 609.344, subd. 1(h)-(j) (1992). At that time, the statute's definition of psychotherapist included clergy: " 'Psychotherapist' means a physician, psychologist, nurse, chemical dependency counselor, social worker, *clergy*, marriage and family therapist, mental health service provider, or other person, whether or not licensed by the state, who performs or purports to perform psychotherapy." Minn.Stat. § 609.341, subd. 17 (1992) (emphasis added). The legislature defined "psychotherapy" as "the professional treatment, assessment, or counseling of a men-tal or emotional illness, symptom, or condition." Minn.Stat. § 609.341, subd. 18 (1992). The statute criminalized sexual penetration between a psychotherapist and patient during a psychotherapy session (section 609.344, subdivision 1(h)); sexual penetration that occurred with a "former patient [who] is emotionally dependent upon the psychotherapist" (section 609.344, subdivision 1(i)); and sexual penetration obtained by means of "therapeutic deception" (section 609.344, subdivision 1(j)).

In 1993, the legislature amended section 609.344, to expand the criminal liability of a psychotherapist to include sexual penetration that occurred between a psychotherapist and patient outside of a therapy session if an "ongoing psychotherapist-patient relationship exists" (subdivision 1(h)(ii)). Act of May 20, 1993, ch. 326, art. 4, §§ 18–20, 1993 Minn. Laws 1974, 2031–33. Simultaneously, the legislature amended section 609.341, subdivision 17, to remove "clergy" from the definition of "psychotherapist" and to create a separate crime of third-degree criminal sexual conduct exclusively for clergy. *Act, id.* The new clergy sexual conduct statute became section 609.344, subdivision 1(*l* ).

After the 1993 amendments, there were significant differences between the elements of the offense of criminal sexual conduct for clergy compared to that for psychotherapists. Essentially, the psychotherapist provisions require proof of some causal connection between the position of the psychotherapist and the sexual conduct, either that the psychotherapist actively abused that position by "therapeutic

---

and the complainant is under the supervision of a corrections facility (subd. 1(m)); and where the sexual penetration occurs during or immediately before or after the actor provides special transportation services to the complainant (subd. 1(n)). In three other situations, consent is not expressly eliminated as a defense but presumably would not be a viable defense, where: the actor uses force or coercion (subd. 1(c)); where the actor knows that the complainant is mentally impaired, mentally incapacitated, or physically helpless (subd. 1(d)); or where the actor is a psychotherapist and the complainant is a former patient who is emotionally dependent on the psychotherapist (subd. 1(i)).

deception" (section 609.344, subdivision 1(j)); the patient was unable to give effective consent because he or she suffered from a "mental or emotional illness, symptom, or condition" (section 609.344, subdivision 1(h), incorporating the definition of "psychotherapy" from section 609.341, subdivision 18); or the patient was "emotionally dependent on the psychotherapist" (section 609.344, subdivision 1(i)).

In contrast, the clergy sexual conduct statute does not require proof of any causal connection between the sexual conduct and the position of the clergy or the mental or emotional state of the parishioner. There is no requirement of proof that the clergy member was in a position to influence the parishioner; that the clergy member abused any such position; that the parishioner sought or received religious or spiritual advice because of any mental or emotional need; or that the parishioner's consent was influenced to any degree by the religious or spiritual advice that was given. Thus, unlike a psychotherapist-patient relationship, where the patient seeks counseling as treatment for a mental or emotional need, a parishioner may seek religious or spiritual advice out of intellectual curiosity without any mental or emotional need that could be seen as vulnerability.

The Establishment Clause of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. As interpreted, the clause forbids state action that (1) does not have a secular purpose; (2) advances or inhibits religion; or (3) fosters excessive government entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To avoid excessive government entanglement, "a state may not inquire into or review the internal decisionmaking or governance of a religious institution." *Odenthal v. Minn. Conference of Seventh–Day Adventists*, 649 N.W.2d 426, 435 (Minn.2002) (citing *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). Bussmann concedes that the statute neither advances nor inhibits religion. At issue, therefore, is whether the statute has a secular purpose or whether the statute causes excessive government entanglement with religion.

*1. Secular Purpose*

The plain language of the clergy sexual conduct statute suggests that the legislation had a secular purpose, even though it separates clergy from other counselors. Bussmann does not vigorously contest this conclusion. Rather, citing *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), he acknowledges that governmental regulation of religion generally survives the secular purpose inquiry.

When I review the legislative history of the 1993 amendments, I see that advocates for the amendments sought to build on the original intent of the legislature to prosecute clergy under the psychotherapist-patient statute, but to make it "more practical to apply." Hearing on H.F. 873, H. Subcomm. Crim. J. and Fam. L. (Jud. Comm.), Mar. 24, 1993 (audio tape) (comments of an Assistant Ramsey County Attorney). The amendment was sought to close a "loophole" in the definition of psychotherapy that allowed clergy members to claim that they were not engaged in secular counseling but rather were engaged in spiritual or religious counseling. Hearing on H.F. 873, H. Subcomm. Crim. J. and Fam. L. (Jud.Comm.), Mar. 24, 1993 (audio tape) (comments of the Executive Director, Walk–In Counseling Center, Minneapolis).

I would conclude that the legislature's intent was to protect Minnesota citizens

from sexual exploitation, which is a secular purpose. The question then becomes whether the clergy sexual conduct statute accomplishes that purpose without fostering excessive government entanglement with religion.

### 2. Excessive Government Entanglement with Religion

I necessarily begin my analysis of this question with our decision in *Odenthal.* Although *Odenthal* focused on civil, not criminal, liability statutes, its analysis is quite useful in identifying the limitations that the Establishment Clause imposes on a state's ability to regulate religion, religious organizations, and religious activities. 649 N.W.2d at 434–41. To ensure that the standards applied for the civil liability of clergy were secular, not religious, we confined our consideration in *Odenthal* to the standards embodied in three statutes that were also applicable to counselors who were not clergy members, namely:

> statutes regarding unlicensed mental health practitioners, Minn.Stat. §§ 148B.60–.71 (1998); statutes setting forth licensure requirements for marital and family counselors, Minn.Stat. §§ 148B.29–.39 (1998); and statutes creating a cause of action for sexual exploitation by a psychotherapist, Minn. Stat. §§ 148A.01–.05 (2000).

*Id.* at 436.[4]

We concluded in *Odenthal* that clergy who provided mental health services equivalent to those provided by other mental health practitioners were subject to the statute; that the statutory definition of

"mental health services" was neutral on its face—describing counseling in secular terms without regard to whether religious or spiritual principles are involved; and that, accordingly, the application of the statute to clergy would not impinge on the religious character of the relationship or excessively entangle the courts in religion. 649 N.W.2d at 437–38. We emphasized that

> the standards of conduct for those providing mental health services apply to all who meet the definition of unlicensed mental health practitioner, regardless of whether the relationship is one of clergy and church member. The statutory standards identified by Odenthal as establishing negligence, including protecting the health, safety and welfare of clients, the confidentiality of communications, and the impartiality of the mental health professional, do not suggest any unique or distinct application with respect to clergy.

*Id.* at 440.

Viewed in the context of *Odenthal,* the absence from the clergy sexual conduct statute of neutral or secular standards raises several concerns. Contrary to the statutes relied on in *Odenthal* to establish secular standards, the clergy sexual conduct statute criminalizes solely the conduct of clergy and prohibits sexual penetration solely when the counseling is "religious or spiritual" in nature. As argued by Bussmann, the statutes in *Odenthal* applied "in spite of [a person's] membership in the clergy," whereas the clergy sexual conduct statute applies "because of [a person's] membership in the clergy." In my view, the standards of the clergy sexual conduct

---

**4.** One of those statutes, Chapter 148A, imposed civil liability standards for clergy, as psychotherapists, that were essentially parallel to the criminal liability standards that, prior to 1993, were applicable to clergy under the psychotherapist criminal sexual conduct statute. Thus a "psychotherapist" was defined for civil liability purposes to include a "member of the clergy" (section 148A.01, subdivision 5) and the statute prohibited certain sexual contact with a "patient or former patient" (section 148A.02).

statute are not "secular on their face," but instead proscribe conduct by expressly incorporating the religious aspect of the relationship and the religious content of the counseling.

I also conclude that the clergy sexual conduct statute establishes legislatively-determined facts that need not be proven at trial or decided by a jury. For example, the statute establishes the irrebuttable presumption that all clergy-advisee relationships have the same religious attributes—that is, that the clergy member is always in a position of power over an advisee; that such power is always embodied in the clergy member's role as a religious or spiritual advisor; that religious or spiritual advice always renders the advisee legally incapable of giving consent to sexual penetration; and that an advisee's consent to sexual penetration is always legally ineffective so long as the advisee is receiving religious or spiritual advice, aid, or comfort. If I am correct that these legislative determinations have established these facts as a matter of law, the only proof that would be required in a prosecution under the clergy sexual conduct statute is that the clergy member had sexual contact with an advisee at a time when the advisee was "meeting on an ongoing basis with [the clergy] to seek or receive religious or spiritual advice, aid, or comfort in private." Minn.Stat. § 609.344, subd. 1(*l*).

In this respect, the clergy sexual conduct statute stands in sharp contrast to the psychotherapist sexual conduct statute, which eliminates consent as a defense only where the state proves facts that render the consent legally ineffective. Thus, if the victim is a current patient, consent is not a defense for a psychotherapist if the state proves beyond a reasonable doubt that there is an "ongoing psychotherapist-patient relationship" (section 609.344, subdivision 1(h)(ii)), which requires proof that

the patient is a person who suffers from a "mental or emotional illness, symptom, or condition" (section 609.341, subdivision 18). If the victim is a former patient, consent is not a defense for a psychotherapist if the state proves beyond a reasonable doubt that the patient is "emotionally dependent upon the psychotherapist" (section 609.344, subdivision 1(i)) or the "sexual penetration occurred by means of therapeutic deception" (section 609.344, subdivision 1(j)). Thus, under the psychotherapist [criminal] sexual conduct statute, the vulnerability of the victim is not presumed to exist, but must be proven by either the pre-existence of a mental or emotional condition or by the deceptive conduct of the psychotherapist. The presence of one or both of these facts is presumed to exist under the clergy sexual conduct statute.

In *Odenthal* we noted that the provider of mental health services was governed by a neutral, non-religious standard because the statute required proof that the person was providing assessment, treatment, or counseling for conditions that were specified in the statute, which did not require inquiry into any religious aspect of the counseling. 649 N.W.2d at 438. The conditions specified in the statute which defined the scope of "mental health services," were "a cognitive, behavioral, emotional, social, or mental condition, symptom, or dysfunction, including intrapersonal or interpersonal dysfunctions." *Id.* (citing Minn.Stat. § 148B.60, subd. 4 (1998)). These conditions provided a secular basis for determining that the consent of the victim was not legally effective. In my view, the clergy sexual conduct statute does not require proof of any such conditions.

The absence of secular standards, and the legislative determination that no consent could be legally effective, would mean that the statute is violated solely or pri-

marily because of the religious identity of the actor or the religious nature of the relationship. For example, an unmarried clergy member who dated a parishioner and had sexual contact by mutual consent would be guilty of the crime if the two were also discussing spiritual and religious matters on an ongoing basis. Or, a parishioner who initiated and persistently pursued a sexual relationship with a member of the clergy would nevertheless be deemed to be incapable of effectively consenting to that relationship so long as the two discussed religious or spiritual issues, however disconnected with the sexual contact that discussion may have been. The absence of secular standards would support the conclusion that the statute is the result of excessive government entanglement with religion.

Ultimately, I conclude that the standards of the clergy sexual conduct statute are not secular and neutral, but instead incorporate religious doctrine, as reflected in the legislative determinations that the clergy member is always in a position of power over an advisee, that any sexual penetration with an advisee is always causally related to the religious and spiritual advice given by the clergy member to an advisee, and that an advisee always lacks capacity to effectively consent to that sexual penetration. I believe that this absence

of secular and neutral standards makes the statute unconstitutional on its face.[5]

I would therefore hold that section 609.344, subdivision (1)($l$) fosters excessive government entanglement with religion, violates the Establishment Clause of the United States Constitution, and is unconstitutional.

## B. The view that the statute does not facially violate the Establishment Clause.

Three Justices disagree with the conclusion stated in part A above and would hold that the clergy sexual conduct statute does not facially violate the Establishment Clause. The discussion of this view is contained in this part B and in the dissent of Chief Justice Russell Anderson.

In order for a court to find a statute facially invalid, it must conclude that the statute "could never be applied in a valid manner." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 797–98, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).[6] For example, in *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the Supreme Court struck down as facially invalid a state law that prohibited peaceful display of a symbol of opposition to organized government. *Id.* at 369, 51 S.Ct. 532. The court held that such a statute "is so vague and indefinite as to

---

**5.** Such a conclusion would not conflict with our decisions applying the evidentiary privilege to communications by a member of the clergy with "any person seeking religious or spiritual advice, aid, or comfort," under Minn.Stat. § 595.02, subd. 1(c) (2006). As described above, our concern with the clergy sexual conduct statute is not based on the prospect that courts will need to decide whether advice given by a clergy member is of a religious or spiritual nature. We have recognized that such a decision involves a narrow fact issue that courts can decide without excessive entanglement with religion. *See, e.g., State v. Rhodes,* 627 N.W.2d 74, 85–

86 (Minn.2001) (affirming district court finding that communication was not protected by the clergy privilege because it was not religious or spiritual in nature); *State v. Black,* 291 N.W.2d 208, 216 (Minn.1980) (same).

**6.** The one exception to this rule, the overbreadth doctrine, permits a challenge to a law on the grounds that the law chills the speech of third parties. *See New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). As this case does not involve free speech issues, the overbreadth exception is not relevant.

permit the punishment of the fair use of [the opportunity for free political discussion]" and therefore "is repugnant to the guaranty of liberty contained in the Fourteenth Amendment." *Id.* Similarly, in *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), the Court struck down as facially invalid a local ordinance that required a license to distribute any literature and gave the chief of police the power to deny a license. 303 U.S. at 451–52, 58 S.Ct. 666. The Court held that the ordinance "strikes at the very foundation of the freedom of the press by subjecting it to license and censorship." *Id.* at 451, 58 S.Ct. 666.

In *New York State Club Ass'n, Inc. v. City of New York*, however, the Supreme Court declined to find a law facially unconstitutional because plaintiffs could not establish that the law was unconstitutional in *all* of its applications. 487 U.S. 1, 11–14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (considering a facial challenge to the New York Human Rights Law, which forbade discrimination based on race and other factors). And in *Taxpayers for Vincent*, the Supreme Court considered a challenge to the constitutionality of a Los Angeles sign ordinance. Noting that the challenging party had not argued that the ordinance could never be validly applied, the Court characterized the attack on the ordinance as "a challenge to the ordinance as applied to [appellees'] activities" and limited its analysis to whether the ordinance was unconstitutional as applied. 466 U.S. at 802, 104 S.Ct. 2118. This court has also found laws unconstitutional as applied, but not facially. *See, e.g., State v. Grossman*, 636 N.W.2d 545, 551 (Minn.2001) (holding Minnesota's patterned sex offender sen-

tence enhancement statute unconstitutional as applied to one defendant and noting our doubts as to whether the statute could ever be constitutionally applied); *McDonnell v. Comm'r of Pub. Safety*, 473 N.W.2d 848, 855 (Minn.1991) (holding a Minnesota statute that required police to advise drivers that they were not permitted to consult with an attorney prior to deciding whether to submit to or refuse blood alcohol content testing, and one that imposed criminal penalties on individuals who refused to submit to blood alcohol testing within five years of a prior driver's license revocation, unconstitutional as applied.).

Those who support this view conclude that the clergy sexual conduct statute is not unconstitutional on its face as a violation of the Establishment Clause because courts can determine whether a complainant sought or received religious or spiritual advice, aid, or comfort by reference to secular principles, not religious precepts. *See Jones v. Wolf*, 443 U.S. 595, 603–04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Odenthal v. Minn. Conference of Seventh–Day Adventists*, 649 N.W.2d 426, 435 (Minn. 2002) ("There is no entanglement problem, however, when the dispute can be resolved according to 'neutral principles of law.' "). They observe that our courts already determine whether parties sought spiritual aid in the context of the clergy privilege. *See State v. Rhodes*, 627 N.W.2d 74, 85 (Minn.2001). They suggest that the state could have put on a case that did not make Bussmann's conviction hinge upon his violation of Catholic Church regulations, but rather upon his act of penetration of a parishioner with whom he met on an ongoing basis to provide religious or spiritual advice, aid, or comfort.[7]

---

7. The model jury instructions for violations of section 609.344 explain the elements of criminal sexual conduct in the third degree:

First, the defendant intentionally sexually penetrated ——.
* * *

The proponents of this view do not agree that the statute reflects legislative determinations that a clergy member is always in a position of power over a parishioner, that sexual contact with a parishioner is always causally related to religious and spiritual advice given by the clergy member, and that a parishioner always lacks capacity to effectively consent to the sexual conduct. They conclude that the statute reflects a legislative determination that a clergy member is in a position of power over a parishioner who seeks or receives religious or spiritual advice, aid, or comfort from the clergy member; that sexual penetration between such a parishioner and clergy member is so often causally related to the religious or spiritual advice, aid, or comfort that criminalizing all such contact is necessary to protect parishioners; and that such a parishioner so often lacks capacity to effectively consent to sexual penetration with the clergy member that criminalizing such contact is necessary to protect parishioners. They suggest that none of these determinations would be unreasonable, or represent governmental entanglement with religion. They conclude that a legislative determination that clergy members often exercise power over those to whom they provide religious or spiritual advice, aid, or comfort is based on a neutral, secular standard that does not implicate religious doctrine.

Those having this view acknowledge that the statute does not require the state to prove that the clergy member used his position or influence to take advantage of the mental or emotional state of the parishioner, but conclude that requiring courts to inquire into the power balance of particular clergy/parishioner relationships would create an entanglement problem. They conclude that it is for the legislature to determine whether the state must prove, in the context of a criminal prosecution, an imbalance of power between the victim and the defendant. *See* Minn.Stat. § 609.095(a) (2006) ("The legislature has the exclusive authority to define crimes and offenses and the range of the sentences or punishments for their violation.").

According to this view, a parishioner who wishes to engage in a sexual relationship with a clergy member can easily give effective consent for purposes of Minn. Stat. § 609.344, subd. 1($l$); she need only stop meeting with the clergy member in private to seek or receive religious or spiritual advice, aid, or comfort. She could still meet with the clergy member in a group for these purposes, and could meet with him privately for any purpose whatsoever other than seeking religious or spiritual advice, aid, or comfort, without violating the statute.

Those with this view do not share the fear that a clergy member who dated and engaged in a mutually consensual sexual relationship with a parishioner would face prosecution if the two were also, as would seem likely, discussing spiritual or reli-

Second, at the time of the sexual penetration, the defendant was or purported to be a member of the clergy.

Third, at the time of the sexual penetration, the defendant was not married to ——.

[1] Fourth, the sexual penetration occurred during the course of a meeting in which —— sought or received religious or spiritual advice or comfort from the defendant in private. Consent is not a defense to this charge.

[2] Fourth, the sexual penetration occurred during a period of time in which —— was meeting on an on-going basis with the defendant to seek or receive religious or spiritual advice, aid, or comfort in private. Consent is not a defense to this charge.

Fifth, the defendant's act took place on (or about) —— in —— County.

10 Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal, CRIMJIG 12.35 (5th ed.2006).

gious matters on an ongoing basis. Because, under the statute, religious or spiritual advice, aid, or comfort must be the primary purpose of the ongoing meetings, they would conclude that a clergy member who meets with a parishioner on an ongoing basis for any other purpose—social enrichment, personal edification, or even sexual gratification—does not violate the clergy sexual conduct statute. They recognize that it may be difficult to determine after the fact whether the parishioner met with the clergy member to seek or receive religious advice, but suggest that this would be no more difficult than determining whether a patient is emotionally dependent upon a psychotherapist, Minn. Stat. § 609.344, subd. 1(i), or whether sexual penetration was accomplished by "therapeutic deception," Minn.Stat. § 609.344, subd. 1(j).

Those sharing this view suggests that the harm targeted by the legislature in subdivision 1(*l*) and many other provisions of section 609.344 is not any particular vulnerability that an individual may have because of that individual's characteristics; instead, the harm targeted is the power imbalances that are likely to be present in these particular types of relationships. Thus, they would not read the statutory definition of psychotherapy in section 609.341, subdivision 18 ("the professional treatment, assessment, or counseling of a mental or emotional illness, symptom, or condition") as making the particular vulnerability that may be associated with mental and emotional illnesses an element of the psychotherapist-patient criminal sexual conduct offense. Instead, they would construe this language as defining a particular relationship that is being protected against the abuse of likely power imbalances. They conclude that this reading is bolstered by an amendment to the statute that criminalized all sexual conduct that occurs during an "ongoing psycho-

therapist-patient relationship," not just sexual conduct that occurs during an actual therapy session, with an emotionally-dependent former patient, or by means of therapeutic deception. Act of May 20, 1993, ch. 326, art. 4, § 20, 1993 Minn. Laws 1974, 2031–33.

Concluding that Bussmann has not demonstrated that all or even most applications of the clergy sexual conduct statute would foster excessive entanglement of government and religion, and that violations of the statute can be determined by secular principles of law, those sharing this view would hold that the clergy sexual conduct statute does not facially violate the Establishment Clause.

## C. The effect of an equally divided court.

■■ Because we are equally divided on the issue of whether the clergy sexual conduct statute facially violates the Establishment Clause of the United States Constitution, we affirm the decision of the court of appeals that the statute does not facially violate the Establishment Clause.

### III.

■■ Bussmann argues that the clergy sexual conduct statute is unconstitutional as applied in his trial. The state relied heavily on religious expert testimony to prove its case and the court allowed the jury to hear discussion that intertwined religious doctrine with state law. We do not criticize these witnesses. We understand their concern for the well-being of the victims and their commitment to seek accountability for offending clergy members. But we are concerned that the state's use of these witnesses engrafted religious standards onto the statute.

The state elicited testimony about Catholic Church doctrine concerning the power

of priests over parishioners. The testimony described that power in religious terms:

> [T]he whole reason we're ordained is to exercise power in the name of the church. That power may be one of the most beautiful and fundamental, which is to change bread and wine into the body and blood of Christ. * * * It may be the power that comes from special access to people as pastors do when we assist people with death, with family crisis, with depression, with a variety of other issues. * * * What I train our clergy is that our long experiences of church is that that power, beautiful and important, central as it is to us, is also inherently dangerous because it can be misused for purposes other than what it's entrusted to us for.

The testimony also described the potential abuses of that power in religious terms, as "pastoring by seduction":

> [S]eduction means essentially any form of pastoring, the end of which is only to deepen the connection between the pastor and the person rather than to lead that person beyond the pastor to Jesus Christ. This would include sexual seduction, drawing people into one's self-pity and a variety of other violations of that fundamental relationship with Jesus.

The testimony described the concern of the Catholic Church with the increased number of complaints about sexual conduct arising out of the pastoral care relationship. These witnesses explained that the complaints of sexual exploitation of adult parishioners outnumbered those of minors. It described the Catholic Church's response, which includes training, public education, financial, emotional, and spiritual assistance to victims, and support for efforts to create civil and criminal remedies for violations. The testimony suggested that the Church's most important solution to the growing number of complaints was to name the perpetrator and to declare the conduct wrongful.

Finally, the testimony described the religious training that Bussmann had received and the complaints that had been made to the Church about Bussmann's behavior. Ironically, this testimony acknowledged that the Church does not regard itself as a mandatory reporter in cases of adult victims unless the victim is incompetent or otherwise vulnerable. Ultimately, the testimony described the determination by the Catholic Church that Bussmann had violated his priestly authority. In other words, the testimony was akin to victim impact testimony, which is only permitted to inform sentencing after a guilty verdict has been returned.

Virtually all of this testimony lacked foundation to connect it to any secular standard, was irrelevant to any secular standard, was inadmissible hearsay evidence, and was highly prejudicial. This testimony bolstered the state's claims by informing the jury that the Church condemned Bussmann's behavior and believed that it was important that he be held accountable. It provided religious standards by which the jury was to judge Bussmann's conduct. It provided a means by which the Church was able to vouch for the credibility of the victims' testimony. It suggested to the jury that a conviction would be important to assist the Catholic Church in solving the problem of offending priests.

In *Odenthal* we suggested that the state's presentation of evidence concerning the standards of the church for pastoral care presents a serious risk of excessive government entanglement. 649 N.W.2d at 436. Odenthal had argued that the standard of care applicable to his civil negligent counseling claim against a clergy member could be drawn from the Sev-

enth–Day Adventist Minister's Handbook. *Id.* We disagreed:

> As a statement of the church's policy regarding pastoral counseling, the Minister's Handbook poses a serious risk of religious entanglement for a court attempting to discern its limits * * *. Thus, Odenthal must state a cause of action in negligence by reference to neutral standards and not by reference to the Minister's Handbook.

*Id.*

The Establishment Clause applies to the several states by virtue of the Fourteenth Amendment's Due Process Clause. *McCreary County v. ACLU of Ky.,* 545 U.S. 844, 853 n. 3, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005); *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). As the United States Supreme Court has interpreted the Fourteenth Amendment, official acts of state judicial officers are subject to the Due Process Clause. *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (stating that " '[i]t is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.' " (quoting *NAACP v. Alabama,* 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958))); *Shelley v. Kraemer,* 334 U.S. 1, 14, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) ("That the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court."). Thus, in order to comply with constitutional require-

ments, the official acts of state judicial officers must satisfy the three Establishment Clause requirements articulated by the Supreme Court in *Lemon v. Kurtzman:* (1) they must have a secular purpose; (2) they must have a principal effect that neither advances nor inhibits religion; and (3) they must not excessively entangle government and religion. 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

Under Minnesota law, "conviction" means the acceptance and recording by the court of a plea, jury verdict, or court finding of guilt. Minn.Stat. § 609.02, subd. 5 (2006); *State v. Hoelzel,* 639 N.W.2d 605, 609 (Minn.2002). Thus, conviction necessarily involves an official act by the court and is therefore subject to the restraints imposed by the Fourteenth Amendment—including the requirements of the Establishment Clause.

As noted, the district court allowed the state to introduce extensive evidence regarding the Catholic Church's doctrine on the religious power of priests over parishioners; the Church's official policy on counseling and pastoral care; the Church's concerns about priest sexual misconduct; and the Church's official investigation and findings regarding Bussmann's behavior. Through the admission of this evidence, the court allowed the religious doctrine of the Catholic Church to become entangled with the criteria set out in the clergy sexual conduct statute for determining the criminality of Bussmann's conduct. The jury's verdict was based on this evidence, and was unavoidably entangled with the religious doctrine introduced into evidence by the state.[8]

---

**8.** Although the official judicial act of conviction is the state action we focus on in this case, we also note that the district court's evidentiary rulings allowing the admission of this testimony may themselves have been sufficient state action to entangle the court with religion.

Further, we conclude that the error resulting from this entanglement was not harmless. Therefore, we hold that the appropriate remedy is to reverse Bussmann's convictions and remand this case to the district court for a new trial that does not entangle the court and religion. *See In re Welfare of M.P.Y.*, 630 N.W.2d 411, 418–19 (Minn.2001).

Affirmed in part, reversed in part, and remanded for a new trial.

PAGE, Justice.

I join in Parts I, II.A, and III of the opinion of Justice Hanson.

MEYER, Justice.

I join in Parts I, II.A, and III of the opinion of Justice Hanson.

ANDERSON, Paul H., Justice.

I join in Parts I, II.B, and III of the opinion of Justice Hanson.

ANDERSON, G. Barry, Justice.

I join in Parts I, II.B, and III of the opinion of Justice Hanson.

GILDEA, Justice, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I join in Part I of the opinion of Justice Hanson. I also join, for the most part, in Part II.B of Justice Hanson's opinion. Finally, I agree with the holding in Part III of Justice Hanson's opinion that Bussmann's conviction, based on the evidence presented by the state at this particular trial, violated the First Amendment prohibition of "law[s] respecting an establishment of religion," as applied to the states through the Due Process Clause of the Fourteenth Amendment. Because this error was not harmless, I agree that the appropriate remedy is to reverse Bussmann's conviction and remand to the district court. I write separately, however, to clarify my view that the unconstitutional state action in this case was the district court's conviction of Bussmann following this particular trial, not the adoption of the statute by the legislature or the application of this statute to Bussmann's conduct.

I believe that the view articulated in Part II.A of Justice Hanson's opinion reads too much into the statute. The psychotherapist provision makes it a crime for a psychotherapist to engage in acts of sexual penetration with his patient during a psychotherapy session or when an ongoing psychotherapist-patient relationship exists. Minn.Stat. § 609.344, subd. 1(h). Similarly, the clergy provision makes it a crime for a member of the clergy to engage in acts of sexual penetration with a person to whom he is providing religious or spiritual advice, aid, or comfort during a private meeting for such purpose or when private meetings for such purpose are ongoing. Minn.Stat. § 609.344, subd. 1(*l*). Thus, both of these provisions require proof of the same two basic elements: (1) an act of sexual penetration; and (2) the existence of a specific relationship between the two parties.

Psychotherapy is defined as "the professional treatment, assessment, or counseling of a mental or emotional illness, symptom, or condition." Minn.Stat. § 609.341, subd. 18. The view articulated in Part II.A of Justice Hanson's opinion reads a "causal connection between the position of the psychotherapist and the sexual conduct" into this definition because the provision requires proof that the patient "suffered from a 'mental or emotional illness, symptom, or condition.'" But the criminal provision does not require proof that such a condition actually exists; rather, it only requires proof of meetings for the purpose

of treating, assessing, or counseling about such a condition. Indeed, it is possible, following one or more assessment sessions, that no such condition would be diagnosed, yet any act of sexual penetration that occurred during an assessment session or during a period of ongoing assessment sessions would be illegal under the statute. Moreover, the statute does not criminalize all acts of sexual penetration involving individuals with a mental or emotional illness—it only criminalizes such conduct with the psychotherapist. Thus, as I read the statute, the harm targeted by the psychotherapist provision is not the inability of the patient to consent to sexual conduct because of a mental illness, but rather the potential for abuse that exists because of the power imbalance that often exists in the psychotherapist-patient relationship. Subdivision 1(*l*) makes the same policy determination with regard to clergy-parishioner relationships.

Based on my reading of section 609.344, subdivision 1(*l*), courts need not make any findings regarding the religious nature of a clergy-parishioner relationship; rather, the state need only prove ongoing private meetings for the purpose of "seek[ing] or receiv[ing] religious or spiritual advice, aid, or comfort." Such findings are already made in the context of the clergy evidentiary privilege, *see State v. Rhodes*, 627 N.W.2d 74, 85 (Minn.2001), and can be made by reference to secular rather than religious principles. This proof avoids any entanglement of the court with religion. Moreover, the record of this case does not suggest any unique circumstances that would require the state to introduce the entangling evidence of religious doctrine in order to prove that Bussmann's conduct violated section 609.344, subdivision 1(*l*).

Thus, I would hold that Minn.Stat. § 609.344, subd. 1(*l*), is neither facially unconstitutional nor unconstitutional as applied to Bussmann's conduct. Instead, I would hold that Bussmann's conviction violated the Establishment Clause given the particular manner in which the state—based on the presentation of its case against Bussmann—invited the jury to base its verdict on religious principles rather than the secular, neutral criteria set forth in the statute.

ANDERSON, Chief Justice (dissenting).

I respectfully dissent, because I would affirm the conviction. I agree with the court's conclusion, stated in Part I of the majority opinion, that the clergy sexual misconduct statute is not unconstitutionally vague.[1] But I disagree with the court's conclusion and disposition, stated in Part III, that the statute is unconstitutional as applied in this case, warranting reversal of the conviction and remand for a new trial. Further, I disagree with the plurality conclusion stated in Part II.A that the statute is unconstitutional on its face. Although I agree with the conclusion stated in Part II.B that the statute is not unconstitutional on its face, I write separately to explain the reasons for my conclusion on that issue.

*Facial Unconstitutionality*

The clergy sexual misconduct statute does not entangle government in religion and therefore does not violate the Establishment Clause. The statute only contemplates application of neutral principles. None of the elements of the offense involve review of church doctrine. The statute is based on legislative judgments about the power imbalance inherent in the clergy-counseling relationship that negates true

---

1. The opinion of Justice Hanson is the majority opinion because a majority of the court joins in Parts I and III and in the disposition announced in that opinion. Parts II.A and II.B are the opinions of two different pluralities.

consent and does not incorporate church doctrine.

The First Amendment requires that civil courts abstain from resolving church disputes that would necessitate an adjudication of controversies over religious doctrine. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (stating that civil courts must defer to "the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity"); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449–50, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (holding that civil courts could not determine whether the general church departed from its doctrine).

But civil courts are not required to abstain from resolving church disputes if it can be accomplished by application of "neutral principles of law" that "free civil courts completely from entanglement in questions of religious doctrine, polity and practice." *Jones v. Wolf*, 443 U.S. 595, 602–04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (noting that the neutral-principles-of-law method in a church property dispute relies "exclusively on objective, well-established concepts of trust and property law"). Civil courts may adopt a neutral-principles-of-law method for resolving church " 'disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " *Id.* (quoting *Md. & Va. Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970)).

We used a neutral-principles approach in *Odenthal v. Minn. Conference of Seventh–Day Adventists*, 649 N.W.2d 426 (Minn.2002), a negligence action against a member of the clergy, alleging improprie-ties in marital counseling. The dispute in *Odenthal* centered on defining the appropriate standard of care. Defendant took the position that any standard of care necessitated assessments of religious components of the counseling relationship. *Id.* at 438. Plaintiff argued that several statutes, including one regulating defendant's conduct as an unlicensed mental health practitioner, could be applied without regard to religion. *Id.* at 436–37. We concluded that an adjudication of the negligence claim by application of neutral standards set forth in the statute regulating conduct as an unlicensed mental health practitioner did not violate the First Amendment. *Id.* at 441.

The neutral-principles approach, as employed by the Supreme Court, does not require civil courts to refrain from review of all church-based facts. For example, in settling church property disputes, civil courts can examine church documents such as property deeds, local church charters, and general church constitutions. *See Jones*, 443 U.S. at 603, 99 S.Ct. 3020. What the neutral-principles approach does require is that any examination of religious documents by civil courts be done "in purely secular terms" and that civil courts not "rely on religious precepts" in resolving disputes. *Id.* at 604, 99 S.Ct. 3020.

The clergy sexual misconduct statute at issue here does not address church disputes and involves only application of neutral principles. The core elements of the offense are: (1) sexual penetration by the actor; (2) the actor is a member of the clergy or purports to be; (3) the actor is not married to the complainant; and (4)(a) the sexual penetration occurred during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private; or (b) the sexual penetration occurred during a period of time in which the

complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private. Minn.Stat. § 609.344, subd. 1(*l* ) (2006).[2] None of these elements involve an examination of doctrinal matters, pastoral qualifications, or tenets of faith—only the nature of the meeting. The determination as to whether clergy advice is of a religious or spiritual nature is the same as that made for the evidentiary clergy privilege. *See, e.g., State v. Rhodes,* 627 N.W.2d 74, 85 (Minn.2001) (basing determination that communication was not privileged in part on finding that content of communication was not religious).

The plurality in Part II.A states that Minn.Stat. § 609.344, subd. 1(*l* ), in eliminating consent as a defense, burdens only the clergy. But the statute also eliminates the consent defense for sexual relationships between physicians, psychologists, nurses, chemical dependency counselors, social workers, marriage and family therapists, mental health services providers, or other persons who provide psychotherapy; other physicians; government and private correctional employees; special transportation employees; and their respective patients or clients. *Id.,* subd. 1(h), (j), (k), (m), (n); Minn.Stat. § 609.341, subd. 17 (2006). The common ground in these relationships is the power imbalance between the parties. "Experts agree that sexual misconduct, as opposed to true consensual sex, occurs because there is a power differential." Thomas P. Doyle & Stephen C. Rubino, *Catholic Clergy Sexual Abuse Meets the Civil Law,* 31 Fordham Urb. L.J. 549, 561 (2004).

The clergy-counselee relationship and secular counseling relationship reflect a similar power imbalance: "[p]eople seeking help, whether of a spiritual or secular nature, are likely to be vulnerable and dependent." Janice D. Villiers, *Clergy Malpractice Revisited: Liability for Sexual Misconduct in the Counseling Relationship,* 74 Denv. U.L.Rev. 1, 43 (1996). This power imbalance is aggravated by: "the counselee's initial vulnerability; the counselor's control of the environment; the confidentiality of the relationship; [and] the leverage gained from unilateral self-revelation." *Id.* at 46. The clergy sexual misconduct provision reflects legislative determinations about the disparity in power in the clergy-counselee relationship, during a period of ongoing counseling in private, that negates true consent.[3]

Certainly, not all clergy counselees and not all patients are vulnerable. Not all clergy and therapists are seen as all powerful. Nevertheless, "[t]he counselee typically pursues secular or religious counseling for marital difficulties, depression and suicidal tendencies, faith crises or uncertainty or coping skills in many facets of her life," and is therefore easily subject to exploitation. *Id.* at 46.

---

2. Minn.Stat. § 609.344, subd. 1(*l* ), criminalizes sexual conduct if:

(*l* ) the actor is or purports to be a member of the clergy, the complainant is not married to the actor, and:
(i) the sexual penetration occurred during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private; or
(ii) the sexual penetration occurred during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private. Consent by the complainant is not a defense[.]

3. Hearing on H.F. 873, H. Comm.Crim. J. and Fam. L., Mar. 24, 1993 (audio tape) (comments of Assistant Ramsey County Attorney) (testifying the statute covered clergy "as recognizing this very intimate and personal relationship that had an inherent power differential so that abuse of that relationship should be criminalized").

This [power] differential is perhaps much more complex and certainly more powerful when it is between a trusted clergyman and a trusting congregant. Because of the role of the clergyman in the congregant's life, there can be no true consent to a sexual relationship, even when the victim is age appropriate. Doyle & Rubino, *supra* at 561–62.

The underlying facts in this case illustrate the exploitation of this power imbalance. One of the complainants sought spiritual help related to family and faith issues. Her husband's employment as a sales representative entailed out-of-town travel. The other complainant sought help for severe depression following the illness and death of her mother. During their meetings, because Bussmann was their priest, they placed their trust in him and disclosed confidential information. When Bussmann first came to the church, he made a list of 20 women, 14 of whom he said later "hit" on him; and out of the 14, 12 were married. At the time of Bussmann's sexual relations with the complainants, he was having sexual relations with at least one other parishioner. Bussmann's sexual misconduct came to light when the first complainant's husband became suspicious, taped a phone conversation, confronted his wife and reported Bussmann to the Archdiocese. The second complainant was discovered during the criminal investigation related to the sexual misconduct with the first complainant. At sentencing, the complainants described their shame and pain. They talked about how their sexual relationships with Bussmann imperiled their marriages and damaged their faith. Instead of supporting the complainants and their families, their church community turned against them.

The plurality in Part II.A distinguishes the psychotherapist provision as eliminating the consent defense only if the state proves facts that render consent legally ineffective, either through proof of therapeutic deception or proof that the patient suffered from a mental dysfunction or was emotionally dependent. The core elements of the analogous psychotherapist provision are: (1) sexual penetration by the actor; (2) the actor is a psychotherapist; (3) the complainant is a patient of the psychotherapist; and (4) the sexual penetration occurred: (a) during the psychotherapy session; or (b) outside the psychotherapy session if an ongoing psychotherapist-patient relationship exists. Minn.Stat. § 609.344, subd. 1(h).[4] A patient is defined as a person who seeks or obtains psychotherapeutic services. Minn. Stat. § 609.341, subd. 16 (2006). Psychotherapy is the professional treatment, assessment, or counseling of an emotional illness, symptom, or condition. Minn.Stat. § 609.341, subd. 18 (2006). Accordingly, Minn.Stat. § 609.344, subd. 1(h) does not require proof of the patient's mental or emotional state, only the nature of the relationship: that psychotherapy was sought for treatment, or even just assessment, of a mental or emotional symptom. Thus, the stark distinction posited by the plurality does not exist. The therapeutic-deception and emotionally-dependent provisions identify separate circumstances of criminal activity.[5]

4. Minn.Stat. § 609.344, subd. 1(h) criminalizes sexual conduct if:

 (h) the actor is a psychotherapist and the complainant is a patient of the psychotherapist and the sexual penetration occurred:
 (i) during the psychotherapy session; or

 (ii) outside the psychotherapy session if an ongoing psychotherapist-patient relationship exists.
 Consent by the complainant is not a defense[.]

5. Minn.Stat. § 609.344, subd. 1(a)-(n) identifies fourteen discrete circumstances of third-

The plurality suggests that criminal liability would attach for sexual relationships between unmarried clerics and parishioners who were incidentally engaged in discussing spiritual or religious matters. But the statute requires more: that sexual penetration "occurred during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private." Minn.Stat. § 609.344, subd. 1(*l*)(ii). The statute contemplates situations in which a cleric provides professional assistance on an ongoing basis, in private, to someone in need.

The plurality in Part II.A. concludes that the clergy provision incorporates religious doctrine, as evidenced by legislative determinations about the power imbalance in all private clergy-counselee relationships that negates true consent. But this is no different than legislative determinations about the power imbalance in all private psychotherapist-counseling relationships, even for assessments of emotional symptoms, that negates true consent. There is no constitutional impediment to legislative review of the power imbalance in clergy-counseling relationships and the factors aggravating the imbalance. *Cf. Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 472 n. 3 (8th Cir.1993) (stating that "[w]hile the district court cannot constitutionally decide the validity of [religious] beliefs, * * * the court may properly determine their existence.") (internal citation omitted). It is for the legislature "to define by statute what acts constitute a crime. * * * [T]he role of the judiciary is limited to deciding whether a statute is constitutional, not whether it is wise or prudent legislation." *State v. Merrill*, 450 N.W.2d 318, 321 (Minn.1990) (internal citation omitted).

In summary, the clergy sexual misconduct statute is based on secular legislative determinations, not on church doctrine. The statute does not require examination of doctrinal matters. That the prosecution chose to present irrelevant church-doctrine evidence, which was completely unnecessary to prove liability as required by the statute, does not demonstrate that it is the statute that fosters the entanglement. I would hold that the clergy sexual misconduct statute does not implicate First Amendment entanglement concerns.

*Unconstitutionality as Applied*

In Part III of the plurality opinion, a majority of the court concludes that the statute is unconstitutional as applied in this case and reverses the conviction, remanding for a new trial. I cannot agree.

An "as applied" challenge argues that the statute is unconstitutional as applied to the individual's conduct. *See, e.g., Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (stating the "general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court"); *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (noting cases involving religious freedom in which the Court held that a statute was "unconstitutionally applied in particular circumstances because it interfered with an individual's exercise of those rights").

degree criminal sexual conduct. Subdivisions 1(i) and 1(j) describe separate circumstances of criminal conduct if a person engages in sexual penetration and

(i) the actor is a psychotherapist and the complainant is a former patient of the psychotherapist and the former patient is emotionally dependent upon the psychotherapist;

(j) the actor is a psychotherapist and the complainant is a patient or former patient and the sexual penetration occurred by means of therapeutic deception. Consent by the complainant is not a defense[.]

But the court in Part III does not question the constitutionality of the statute as applied to Bussmann's conduct. Rather it is the state's presentation of church-doctrine evidence that is the driving force of the rationale stated and the disposition reached in Part III. The issue then would be whether the admission of that evidence violated Bussmann's Fourteenth Amendment due process right to a fair trial, not the constitutionality of the criminal statute as applied to Bussmann's conduct. The evidentiary issues, however, are not properly before us. Bussmann included the evidentiary issues in his petition for review. In granting review of the constitutional claims, we expressly declined review of the remaining issues. Consequently, those issues were neither briefed nor argued before us. Because we do not decide issues that are not properly before us, I would not base the resolution of this case on the evidentiary issues.

Furthermore, even if it were appropriate to review those evidentiary issues, they would not warrant reversal. Given that (1) the trial court provided limiting instructions to the jury, (2) the state and defense counsel made clear in closing arguments that the jury's duty was to apply Minnesota law and not church law, and (3) the sole issue in dispute was the existence of an ongoing clergy-counselee relationship, in light of defense counsel's concessions in opening remarks that "Mr. Bussmann was a priest" and that he "had sexual relations" with two parishioners, I would hold that the evidentiary errors with which the court is concerned were harmless.

For these reasons I would affirm the conviction.