MANSFIELD, Justice.
A pastor who had sexual relations with four women in his congregation was convicted of four counts of sexual exploitation by a counselor or therapist and one count of a pattern or practice to engage in sexual exploitation by a counselor or therapist. See Iowa Code § 709.15(2)(a), (c) (2013).[1] *427 The pastor appealed, contending: (1) the district court failed to properly instruct the jury on the sexual exploitation statute; (2) the district court abused its discretion in excluding expert testimony concerning differences between pastoral care and pastoral counseling; (3) the evidence was insufficient to support the pastor’s convictions; (4) the district court erred in denying the pastor’s discovery request for one of the victim’s counseling records; (5) the sexual exploitation statute is unconstitutional as applied ,to the pastor; (6) the district court wrongly excluded certain fact evidence; and (7) the district court erred in the amount of restitution awarded against the pastor.
On appeal, the court of appeals reversed and remanded for a new trial. It found that the jury instructions were improper and the district court had abused its discretion in excluding the proffered expert testimony. Upon further review, we respectfully disagree with the court of appeals and find no error on these points. We therefore vacate the court of appeals decision.
We also reject the pastor’s remaining claims of error, with two exceptions. We find the district court should have conducted an in camera review.of the counseling records. We therefore remand so this review may occur, along with further proceedings if necessary. We also reverse the restitution award and remand for further proceedings thereon. In all other respects, we affirm the pastor’s convictions and sentence.
I. Background Facts and Proceedings.
We recite the facts in the manner most favorable to the jury verdicts.[2]
Patrick Edouard served as the-pastor of the Covenant Reformed Church in Pella from 2003 to 2010. Witnesses testified that his sermons were “amazing,” “great,” and “dynamic.” He was a “very talented speaker.” “He definitely could preach the word of God.”
V.B. and her husband were members of the church from the time Edouard arrived in 2003. In 2005, Edouard began making unsolicited calls to V.B. on her cellphone. V.B. was undergoing fertility treatments unsuccessfully and was struggling with her infertility. Edouard began asking questions about V.B.’s personal life, and she began to confide in him.
V.B. and her husband decided to look at international adoption. A potential opportunity arose to adopt four siblings from abroad as a group. V.B. was personally struggling with this adoption, and at the recommendation of her husband and her mother she decided to see Edouard. As V.B. related,
I think it was in January or February of 2006, and we were getting ready -to adopt the sibling group ..., and Í called him from my office and told him that I wanted to come see him.
And he said, ‘Great. I’ve been encouraging you to do that, to come see me. You know I’ve told you you can talk to me anytime.’ And so he said, ‘Just come tonight. We can just meet here at my study.’
When V.B. arrived at Edouard’s house, Edouard’s wife and family were present. Edouard told his wife, “We could be a while,” and he and V.B. headed down to the study in the basement. Edouard then locked the door to the study so, as he *428 explained, the children would not interrupt them. The study served as Edouard’s office, and had bookshelves, a desk, and two couches.
Edouard asked V.B. how she was doing, and she explained she was really struggling with this adoption. “I wasn’t sure if it was what God wanted for me in my life,” she said. Edouard asked V.B. about her marriage and whether her husband was “meeting [her] needs.” V.B. started to cry and said that things were difficult. At that point, Edouard made advances toward her and had sexual relations with her.
Edouard continued to call V.B. on her cellphone thereafter. He repeatedly told V.B. that her husband was not meeting her needs. He also told V.B. he was attracted to her. They would talk two or three hours a day. V.B. would call Edouard, in addition to Edouard calling V.B. This lasted for months. Edouard also arranged liaisons with V.B. during the workday at hotel rooms and other buddings near V.B.’s office. Edouard would appear at V.B.’s workplace uninvited.
Edouard insisted to V.B. that she did not really want to adopt, that she was doing it to please her husband. He told V.B. that her real struggles resulted from her unhappiness in her marriage — “the sexual frustration.” V.B. testified, “His role was to protect me, because I had all of this sexual energy that needed to be released, and he had to be there to protect me.”
Edouard asked V.B. for money. As V.B. explained,
he would make references to ... it’s possible that ... God brought us together so that ... I can provide for him out of the excess of my abundance, what I had, I could in turn bless him with that.
Edouard made it clear he did not want a loan, because he could get a loan elsewhere and did not want to be burdened with a repayment obligation. V.B. gave Edouard a total of $70,000.
Eventually, after V.B. adopted a child, the relationship cooled. In approximately November 2009, V.B. called Edouard and told him she knew what he was doing, “that he’s trying to get women into counseling for the purpose of trying to have sexual contact with them.” Edouard panicked and tried to call or see V.B. at her office, but V.B. refused to have any communication with him for several months. Their sexual relationship ended. V.B. did not report anything to the church elders or the police at the time, because she did not think she would be believed.
S.K. and her husband were also active members of the Covenant Reformed Church when Edouard arrived in 2008. Four years later, when S.K.’s husband happened to be out of the country, Edouard began calling S.K. to check up on her.
S.K.’s father was going through a severe illness at that time and later in 2007 passed away. S.K’s husband was depressed. S.K.’s daughter was having problems in her marriage. S.K. was feeling down because of her father’s death and the troubles in her daughter’s marriage. S.K. also learned that her husband had had two affairs. In addition, S.K.’s best friend passed away.
Edouard called S.K. on her cellphone while S.K. was driving and wanted to know how she was doing. S.K. responded that she was not doing very well. S.K. started shaking; she pulled her car over. At this point Edouard made a comment to S.K. that “he would like it if we could be together under the cool, crisp sheets.” He added, “You know, if you ever need anybody to talk to, you know, call me. I’ll always be there for you.” S.K. was shocked by Edouard’s comment.
*429 However, some months later, in early 2008, S.K. called Edouard because she “just had absolutely nobody to talk to.” Her relationship with her husband was rocky. Edouard sensed something was going on and said, “You can tell me ... things, and I’ll listen.” S.K. asked him to come see her, because she wanted to discuss her problems in her marriage with him. At the meeting, she disclosed her husband’s affairs to Edouard. After about thirty minutes of conversation, Edouard asked S.K. if he could kiss her. Thereafter, Edouard and S.K. had many meetings where they kissed. They began having sex.
In the spring of 2008, Edouard took S.K. down to the study in the basement of his house. He locked the door, and S.K. thought they would talk. Instead, they had sex. Afterward Edouard told her:
You will never tell anybody. The elders will never believe you. They will only believe me. I’ll make sure everybody knows you’re crazy. You’ll kill your husband.... You’ll destroy the church. You’ll hurt your family and you will hurt [my family].
S.K. had sexual relations with Edouard a total of six to eight .times. S.K. felt that Edouard “had power” over her. “He made me feel like I depended on him,” she said.
Eventually Edouard terminated the relationship. But he said to S.K., “Call me if you ever need me or need somebody to talk to, I’ll always be there for you night or day.”
W.B. and her husband also belonged to Covenant Reformed Church when Edouard became the pastor in 2003. W.B.’s father had been a pastor himself.
In August 2007, W.B. attended a church service alone. Edouard approached her after the service and asked how she was doing. As the conversation progressed, W.B. felt Edouard was flirting with her. During the course of the week, Edouard called again. The discussion was again flirtatious. W.B. could not sleep or eat. She prayed.
On the following Thursday, W.B. asked Edouard for a meeting. She intended to “let him down.” It was arranged for the meeting to occur in the office in Edouard’s home. Edouard assured W.B. it was fíne to come to his home during an evening, as he “counsels women” in his home.
When W.B. arrived, Edouard and his family were there. Edouard took W.B. down to the basement office and locked the door. Edouard asked W.B. very personal questions. Edouard posed “a lot of questions — very concerned about how I was doing, how my father is doing.” W.B.’s father had recently been diagnosed -with Alzheimer’s. W.B. disclosed to Edouard that she had been sexually abused as a child. The conversation lasted a couple of hours. There was no sexual contact.
Edouard and W.B. continued to meet. They had sexually charged conversations. Soon they began to have sex. Edouard told W.B. not to tell anyone because “nobody would understand this. Even if you feel close to your husband some night, never tell him. Never think he’s going to understand this.” Edouard and W.B. engaged in sexual activity over a period of years. During the course of her sexual relationship with Edouard, W.B. went to marital counseling with her husband. Edouard asked W.B. to recite what she had been told at the marital counseling sessions and then indicated to W.B. whether or not to follow that advice.
A.B. and her husband were also members of the church when Edouard was appointed pastor. In the spring of 2008, A.B. had a young child with special needs, her mother-in-law had passed away, and *430 she had an overworked husband. As A.B. put it, “My plate was very full.” A.B. had seen a physician and had been prescribed an anti-depressant and anxiety medication, which she was taking.
At that time, Edouard called A.B. and asked to set up a meeting. She recounted, “He just wanted to make sure that I was doing okay....” Eventually a meeting was set for a school day in April in Edouard’s basement study. Edouard locked the door from the inside. They began with conversation. Edouard probed A.B. on whether she felt stressed. He asked her about her family issues. He asked A.B. whether she had had premarital sex. After a while, Edouard told A.B. that he was very fond of her and “would like to get to know [her] better.” Edouard added, “[SJomebody needs to take care of you. You have your hands full.” A.B. became uncomfortable. Her feet were trembling.
The encounter ended because A.B. had to leave to pick up her son. But other conversations followed. Edouard told A.B., “I just want you to sit and tell me everything about you.” Edouard asked A.B. about her sex life, telling her she could trust him. He frequently asked whether A.B. had been sexually abused as a child. As A.B. put it, “[T]he questions were getting deeper and [he was] getting to know me more and more, I guess knowing my vulnerabilities, ... where the voids were in my life.”
Soon Edouard asked to meet A.B. at her home. After he arrived, he kissed her. Subsequently, Edouard and A.B. called each other many times a day. They kissed and made out. Á.B. shared with Edouard that she longed for someone to take care of her. By May 2008 Edouard and A.B. were having sex. This continued at least once a week for the next two-and-a-half years. Edouard advised A.B. that this was a “secret relationship, and we need to keep [it] a secret.”
In May 2010, Edouard told A.B. he had something he needed to get off his chest. He disclosed to her that he had had sexual relationships in the past with V.B. and S.K. V.B. is A.B.’s sister-in-law. A.B. was “devastated and shocked.” She “had a very difficult time.” Yet Edouard and A.B. continued their sexual relationship. According to A.B., “[H]e was just constantly always evaluating me.”
In December 2010, A.B.’s husband arrived at home as Edouard and A.B. were having sexual relations. He saw Edouard’s vehicle and became suspicious. He spoke to his own brother (V.B.’s spouse) and the two of them put the stories together. Then A.B.’s husband went to the elders of the church.
Edouard resigned immediately. He called S.K. and informed her he had resigned because he had been caught kissing the hand of another woman. He reminded her not to disclose their sexual relationship. He also called W.B. and told her he had resigned because two affairs had come to light. He told W.B., “If anybody says you’re one of them, just deny it. I will never tell anybody, and this will all blow over. I love you.” He made W.B. role-play and rehearse her denials.
Edouard was charged with three counts of sexual abuse in the third degree in violation of Iowa Code section 709.4(1), four counts of sexual exploitation by a counselor or therapist in violation of section 709.15(2)(c), and one count of engaging in a pattern or practice of sexual exploitation by a counselor or therapist in violation of section 709.15(2)(a).
Following a change of venue, the case went to trial in Dallas County, commencing August 13, 2012. Each of the four victims testified. Edouard and his wife *431 testified for the defense. Edouard acknowledged having sexual relations with all four women, but maintained that it was consensual. Edouard denied having provided mental health services to any of the women.
The jury found Edouard not guilty on the three sexual abuse charges, but guilty on the five sexual exploitation charges. He was sentenced to one year imprisonment on each of the Iowa Code section 709.15(2)(c) counts, with the sentences to run consecutively. He was sentenced to five years imprisonment on the section 709.15(2)(a) count, with the sentence to run concurrently with the section 709.15(2)(c) sentences. Edouard timely appealed.
On appeal, Edouard argues: (1) the evidence was insufficient to prove that he provided mental health services to V.B., S.K., W.B., or A.B.; (2) the district court erred in denying his discovery request for W.B.’s counseling records; (3) the sexual exploitation statute is unconstitutional as applied to him; (4) the district court abused its discretion in excluding expert testimony relating to the differences between pastoral counseling and pastoral care; (5) the district court erred in excluding certain fact evidence; (6) the district court erred in omitting certain jury instructions; and (7) the district court erred in the computation of restitution.
We transferred the case to the court of appeals, which reversed and remanded for a new trial. The court of appeals found the district court had failed to properly instruct the jury on the “mental health services” element of the sexual exploitation counts and had wrongfully excluded Edouard’s proposed expert testimony. The State applied for further review, and we granted the application.
II. Standard of Review.
“We review challenges to jury instructions for correction of errors at law.” State v. Frei, 831 N.W.2d 70, 73 (Iowa 2013). The related claim that the district court should have given a requested instruction is reviewed for abuse of discretion. Id.
Constitutional challenges to the district court’s discovery rulings are reviewed de novo. State v. Thompson, 836 N.W.2d 470, 476 (Iowa 2013); State v. Cashen, 789 N.W.2d 400, 405 (Iowa 2010), superseded hy statute, 2011 Iowa Acts ch. 8 § 2. We likewise review de novo challenges to a statute’s constitutionality. Thompson, 836 N.W.2d at 483. Statutes are presumed to be constitutional. Id.
The district court’s rulings on the admissibility of evidence are reviewed for abuse of discretion. State v. Huston, 825 N.W.2d 531, 536 (Iowa 2013). Additionally, “[w]e review challenges to the sufficiency of the evidence for correction of errors at law.” State v. Neiderbach, 837 N.W.2d 180,190 (Iowa 2013). Finally, restitution orders are reviewed for correction of errors at law. State v. Hagen, 840 N.W.2d 140,144 (Iowa 2013).
III. Analysis.
We begin our consideration of Edouard’s appeal with the instructional and evidentia-ry issues that were the basis of the court of appeals’ reversal and remand.
A. Jury Instructions. According to the Iowa Code:
2. Sexual exploitation by a counselor or therapist occurs when ány of the following are found:
[[Image here]]
(c) Any sexual conduct with a patient or client or former patient or client within one year of the termination of the provision of mental health services by *432 the counselor or therapist for the purpose of arousing or satisfying the sexual desires of the counselor or therapist or the patient or client or former patient or client....
Iowa Code § 709.15(2)(c). Sexual exploitation by a counselor or therapist within the meaning of section 709.15(2)(c) is considered a serious misdemeanor. See id. § 709.15(4)(c). Additionally, it is a class “D” felony for a counselor or therapist to engage in a “pattern or practice or scheme of conduct” of sexual exploitation. See id. § 709.15(2)(a), (4)(o).
The statute defines “counselor or therapist” as follows:
“Counselor or therapist” means a physician, psychologist, nurse, professional counselor, social worker, marriage or family therapist, alcohol or drug counsel- or, member of the clergy, or any other person, whether or not licensed or registered by the state, who provides or purports to provide mental health services.
Id. § 709.15(l)(a).
Thus, Iowa law makes it a crime for anyone who provides “mental health services” to another person to engage in sexual conduct with that person while the mental health services are being provided or within one year thereafter. Id. § 709.15(l)(u), (2)(c). The law does not require the defendant to have any particular status. Id. § 709.15(l)(a). The defendant, for example, need not be a professional or a clergyperson. Id. All that is required is that the defendant (1) provided “mental health services” to a person and (2) engaged in sexual conduct with that person less than one year later. Id. § 709.15(l)(u), (2)(c).
The statute in turn defines “mental health services” to mean “the treatment, assessment, or counseling of another person for a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction.” Id. § 709.15(l)(d).
We have considered and rejected vagueness and overbreadth challenges to this law in the past. In State v. Allen, we affirmed the conviction of a hypnotherapist who engaged in sexual conduct with a patient, while rejecting a vagueness and overbreadth challenge to the statute. 565 N.W.2d 383, 337-38 (Iowa 1997). The defendant there had fondled the victim and attempted sexual intercourse with her during hypnotherapy sessions, which also involved the provision of alcoholic beverages and readings of Tarot cards. Id. at 335. We reasoned that the statute did not reach a substantial amount of protected conduct because “[a] person of ordinary intelligence could understand that the term ‘mental health services’ ... does not encompass strictly personal relationships involving the informal exchange of advice” and would rarely if ever “apply to a marriage relationship.” Id. at 337-38.
In State v. Gonzalez, we reversed the dismissal of a trial information charging a psychiatric nursing assistant with violating the statute. 718 N.W.2d 304, 305 (Iowa 2006). According to the information, the defendant had inappropriately touched a female patient’s genital area. Id. Accepting the facts in the information as true, we found it sufficient to allege criminal conduct. Id. at 308-09. The defendant had provided “treatment” because he “performed nursing tasks to assist in providing care of psychiatric patients” and “assessment” because he “performed nursing tasks to assist in monitoring psychiatric patients.” Id. at 308. In dicta we also quoted a definition of “counseling” from Webster’s dictionary, stating that the term means:
“a practice or professional service designed to guide an individual to a better *433 understanding of his problems and potentialities by utilizing modern psychological principles and methods esp. in collecting case history data, using various techniques of the personal interview, and testing interests and aptitudes.”
Id. at 308 (quoting Webster’s Third New Int’l Dictionary 518 (unabr. ed.2002)). Our opinion, however, did not address whether the defendant had provided counseling.
We also rejected vagueness and over-breadth challenges in Gonzalez. Regarding vagueness, we explained:
Any person who renders “treatment, assessment, or counseling of another person for a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction” provides “ ‘[mjental health service.’” Id. § 709.15(l)(d). There is no doubt the language of section 709.15 applies to the services Gonzalez is alleged to have provided to the female patient under the facts in the trial information and attached minutes. Therefore, we conclude Gonzalez’s vagueness claim is without merit.
Id. at 810. We then refused to find the statute overbroad because Gonzalez had not identified any protected conduct. Id.
Edouard does not ask us to reexamine Allen or Gonzalez. He does not argue on appeal that the statute is void for vagueness or overbroad. Instead, we are asked to decide whether the district court’s sexual exploitation jury instructions were proper.
Here, for each alleged victim, the district court instructed the jury as follows:
The State must prove each of the following elements of Sexual Exploitation by a Counselor or Therapist as to [alleged victim]:
1. On or about [relevant time period], the defendant engaged in sexual conduct with [alleged victim].
2. The defendant did so with the specific intent to arouse or satisfy the sexual desires of either the defendant or [alleged victim].
3. The defendant was then a counselor or therapist.
4. [Alleged victim] was then receiving mental health services from the defendant, or had received mental health services from the defendant within one year prior to the conduct.
Additionally, the court instructed the jury that “a ‘counselor or therapist’ includes a member of the clergy, or any other person, whether or not licensed or registered by the State, who provides or purports to provide mental health services.”
Finally, in Instruction 25, the court provided the jury with the following definition of “mental health services”:
As used in element number 4 of Instructions No. 18, 19, 20, and 21, ‘mental health services’ is the providing of treatment, assessment, or counseling to another person for a cognitive, behavioral, emotional, mental or social dysfunction, including an intrapersonal or interpersonal dysfunction. It does not include strictly personal relationships involving the informal exchange of advice, nor does it include the giving of general spiritual advice or guidance from a clergy member to congregants. It contemplates a counseling relationship with the clergy member established for the purpose of addressing particular mental, in-trapersonal or interpersonal dysfunctions.
Thus, the jury was not only given the statutory definition of mental health services, see Iowa Code § 709.15(l)(d), the jury was also told — consistent with Allen — that mental health services do not *434 involve informal advice. Additionally, in Instruction 25, the district court excluded general spiritual advice or guidance from the definition of mental health services. And Instruction 25 required the State to prove a counseling relationship, not merely some counseling.
In crafting this instruction, the district court went beyond the Iowa State Bar Association Criminal Jury Instruction, which simply restates the statutory definition of mental health services. See Iowa State Bar Ass’n, Iowa Crim. Jury Instruction 920.5 (2018). Essentially, the district court adopted a middle position between the parties. The State had asked that only the ISBA instruction be given. The defendant had requested the following additions to the ISBA instruction:
Counseling means a practice or professional service designed to guide an individual to a better understanding of his or her problems and potentialities by utilizing modern psychological principles and methods especially in collecting case history data, using various techniques of personal interview, and testing interests and aptitudes.
Mental health services does not mean mere spiritual advice or guidance provided by a member of the clergy. Nor does it encompass strictly personal relationships involving the informal exchange of advice.
The district court, as can be seen, incorporated some of the defendant’s proposals (i.e., the second paragraph) but not all of them (i.e., the first paragraph).
Edouard argues that his definition of counseling, drawn from certain language in Gonzalez, should have been included in the court’s jury instructions. “[T]he court is required to give a party’s requested instruction so long as it states a correct rule of law having application to the facts of the case and when the concept is not otherwise embodied in other instructions.” State v. Becker, 818 N.W.2d 135, 141 (Iowa 2012) (internal quotation marks omitted). However, “the court is not required to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case.” Id. (internal quotation marks omitted).
There is no dispute the district court provided the jury with Iowa Code section 709.15(1)(& )’s complete definition of “mental health services.” What the court did not do is go a step further. That is, the district court did not tell the jury what the word “counseling,” as used in that statutory definition, meant. “Counseling” is not defined in the statute. Edouard contends the jury should have been told counseling is limited to “modern psychological principles and methods especially in collecting case history data, using various techniques of personal interview, and testing interests and aptitudes.”[3] Edouard, in other words, wanted the jury to be told that in order for him to be convicted, any “counseling” he provided had to have been based upon a modern psychological approach.
We have said:
In criminal cases, the court is required to instruct the jury on the definition of the crime. Generally understood words of ordinary usage need not be defined; however, technical terms or legal terms of art must be explained.
State v. Kellogg, 542 N.W.2d 514, 516 (Iowa 1996) (citation omitted). “Counseling” is certainly a word of ordinary usage. Thus, it did not need to be specially defined for the jury unless the legislature meant to use it in a technical way in *435 section 709.15 or viewed it as a “legal term of art.” We do not believe the legislature had such a view of “counseling.”
“[S]tatutes must be read in their entirety.” State v. DeSimone, 839 N.W.2d 660, 666 (Iowa 2013). Read as a whole, Iowa Code section 709.15 does not appear to use the term “counseling” in a technical or specialized way. To the contrary, the statute expressly covers members of the clergy. See Iowa Code § 709.15(l)(a). These individuals typically do not perform psychotherapy or use “modern psychological principles and methods especially in collecting case history data, using various techniques of personal interview, and testing interests and aptitudes.”
Additionally, the statute by its terms does not require that the defendant be “licensed or registered by the state,” and it covers even persons who merely “purport[] to provide mental health services.” Id. This again suggests that the legislature did not intend a strict definition of counseling limited to modern psychological principles and methods,.so long as the individual was addressing “a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction.” See id. § 709.15(l)(d).
Furthermore, we do not believe our pri- or section 709.15 caselaw supports Edouard’s requested jury instruction. In Allen we affirmed the conviction of a hypnotherapist who plied his victim with alcohol and Tarot cards. See 565 N.W.2d at 335. While we excluded mere informal advice from the coverage of the statute, we did not say that the use of “modern psychological principles and methods” was required. See id. at 337. To the contrary, the defendant there was a charlatan who used (or purported to use) some of the oldest methods in the book — hypnotism, adult beverages, and fortune telling. See id. at 335.
Gonzalez, as noted, did not involve “counseling.” See Gonzalez, 718 N.W.2d at 308. In addition, although we quoted some dictionary definitions of statutory terms, we did so to demonstrate the defendant’s conduct was covered by the statute, not to indicate those definitions set forth the outermost limits of the law. ' See id.
Notably, when we rejected the argument later in Gonzalez that the statute was unconstitutionally vague, we reverted -to the statutory definition of “mental health services,” not to any of the dictionary definitions we had previously quoted. See id. at 310. Had we intended the dictionary definitions to be a required gloss on the statute, we logically would have repeated them and relied on them in discussing. the vagueness question. Thus, we do not read Gonzalez as endorsing a definition of “counseling” limited to “modern psychological principles and methods.”
For these reasons, we reject Edouard’s challenge to Instruction 25. Edouard’s other challenges to the jury instructions are less substantial. He contends the jury should have been told that each alleged victim had to have been his “patient or client” in order to sustain a guilty verdict. This argument is purely form over substance, because the statute defines a “patient or client” as “a person who receives mental health services from the counselor or therapist,” see Iowa Code § 709.15(l)(e), and the jury was told that each of the alleged victims had to have “received] mental health services” from Edouard.
Edouard also urges that the jury should have been given a list of “all the enumerated professions” referenced in section 709.15(l)(a), including those which had no applicability to the case, such as *436 physicians, psychologists, nurses, professional counselors, social workers, marriage or family therapists, and alcohol or drug counselors. See id. § 709.15(l)(a). Instead, the jury was just told that “a ‘counselor or therapist’ includes a member of the clergy, or any other person, whether or not licensed or registered by the State, who provides or purports to provide mental health services.” We see no error. The district court’s instruction was an accurate statement of the law; it left out only those portions of the statute that had no bearing on the case.
B. Expert Testimony. At trial, Edouard tried to offer testimony from a forensic psychiatrist, Dr. Hollida Wake-field, describing differences between “pastoral care” and “pastoral counseling.” In an offer of proof, Dr. Wakefield testified there is a difference between pastoral care and pastoral counseling that is “recognized and accepted generally in the ... theological community.” Dr. Wakefield testified that pastoral care occurs when
somebody comes with a specific problem, you get an idea of what the problem is, you formulate a treatment plan, you meet with the person in a structured way. It is usually time limited. It doesn’t go on for months and years.
Based on her review of the depositions given by the four women, Dr. Wakefield concluded Edouard’s interactions with them did not “fit the definition of pastoral counseling.”
The district court refused to allow the testimony. It reasoned it was the court’s duty
to instruct the jury on what the law is regarding mental health services and counseling ... and that it is the function of the jury to determine whether the defendant’s conduct did or did not constitute the provision of mental health services by a counselor or therapist.
It excluded Dr. Wakefield’s testimony “regarding pastoral care or pastoral counseling” because “neither ... are a part of the elements of this case.”
The admissibility of expert testimony in a criminal case “falls squarely within the trial court’s sound discretion.” State v. Hulbert, 481 N.W.2d 329, 332 (Iowa 1992). Upon our review, we do not believe the court abused its discretion. Here, in effect, the defendant wanted to call an expert to provide the defendant’s own definition of the crime, and then to explain the defendant had not committed it.
Even if the theological community were in agreement that Edouard’s actions did not amount to pastoral counseling, that would not resolve whether Edouard’s actions fit within the statutory definition of mental health services. See, e.g., People v. Littlejohn, 144 Ill.App.3d 813, 98 Ill.Dec. 555, 494 N.E.2d 677, 686 (1986) (noting the district court improperly allowed evidence by a doctor that confused the jury as to the legal definition of insanity by testifying to a “definition [that] may have medical meaning to clinicians,” but “clearly [did] not comport with Illinois definition of insanity for legal purposes”); State v. Williams, 431 So.2d 885, 888-89 (La.Ct.App.1983) (upholding the convictions of the defendant, a prison inmate, on one count of forcible rape and one count of attempted forcible rape against a fellow inmate and rejecting the defendant’s argument that the trial judge had erred in excluding the defendant’s expert witness testimony about “the relationship between prison security and consensual versus nonconsensual sex”); State v. Spano, 328 N.J.Super. 287, 745 A.2d 598, 601-02 (N.J.Super.Ct.App.Div.2000) (upholding the exclusion of expert testimony on the meaning of “worrying” in a statute which allowed a person to kill a dog if it was “worrying” a *437 domestic animal and affirming the defendant’s conviction).
In 1925, we considered the appeal of an osteopath who, under the statutes of that time, had been convicted of practicing medicine without a license. See State v. Gibson, 199 Iowa 177, 178, 201 N.W. 590, 590 (1925). The defendant argued on appeal the trial court had erred in excluding expert testimony as to the technical meaning of “internal curative medicine.” Id. We rejected the appeal, reasoning the words “do not import a technical meaning,” and therefore the expert testimony was properly excluded. Id. at 178, 180, 201 N.W. at 590, 591. The same basic principles concerning admissibility of expert testimony apply today.
In order for the expert testimony to be admissible, it must “assist the trier of fact to understand the evidence or to determine a fact in issue.” Iowa R. Evid. 5.702. In other words, it must add something to the jury’s determination of whether Edouard’s actions fell within the legal definition of mental health services. The specialized meaning given to a term by the theological community is ultimately beside the point in determining whether Edouard’s actions met the legislature’s definition of the crime. Notably, Dr. Wakefield’s indicia of pastoral counseling — i.e., the existence of a “treatment plan,” the “structured” meetings, and presence of time limitations — do not appear anywhere in section 709.15. Hence, the district court did not abuse its discretion in excluding Dr. Wakefield’s proposed testimony.
C. Sufficiency of the Evidence. Edouard also contends there is insufficient evidence to sustain a guilty verdict on any of the charges. In particular, he disputes the sufficiency of the evidence that he provided mental health services as defined in Iowa Code section 709.15(l)(d) to any of the four women.
In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpa-tory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.
State v. Sanford, 814 N.W.2d 611, 615 (Iowa 2012) (citations omitted) (internal quotation marks omitted).
We begin by noting a few common facts. All four women were members of Covenant Reformed Church; Edouard had been their pastor for several years. Three of the four had preexisting marital problems in addition to other difficulties in their personal lives. The fourth developed such problems after getting involved with Edouard, who claimed to be resolving them. Two of the four went to Edouard’s office initially thinking they would receive help from him, and Edouard quickly ended up having sex with both of them (one of them in the office that day). Before and during his sexual encounters with each of the four women, Edouard asked each of them deeply personal and probing questions, purporting to guide them through their personal difficulties.
We now review the evidence specifically relating to V.B. She was “really struggling *438 with going through” with an international adoption of four siblings. She decided to see her pastor, Edouard, to discuss these issues and her own infertility.
Edouard was immediately receptive. He responded, “I’ve told you, you can talk to me anytime.” He invited her to his office, where he asked her how she was doing. V.B. explained that she was “really struggling” and that ■ it was a “horrible, painful time” for her. After that, Edouard moved into questioning about V.B.’s marriage and whether her husband was “meeting her needs.” V.B. began to cry. Regarding her relationship with her husband, V.B. told Edouard that “[i]t was hard that we were both hurting and not able to hurt together, to connect together and hurt through it; that we just seemed like we were separate. It was hard.” By the end of the meeting, Edouard was having sexual relations with V.B.
V.B. added that in her faith and the way she was raised, “[w]e just didn’t go to outside counselors...: [Y]ou would go to the elder or the pastor and that was it.”
S.K., like V.B., was experiencing marital problems when she decided to call Edouard as a result of “all the stresses in [her] life.” She had previously sought counseling from Edouard after her daughter had been sexually abused by another member of the congregation. Her husband had recently confessed infidelities to her. S.K. felt their “relationship was rocky,” and that she “had absolutely nobody to talk to.” In addition to the marital problems S.K. was suffering, she was also coping with the recent death of her best friend. Edouard “sensed something was going on,” and Edouard explained to S.K. she could tell him “things, and [he would] listen.” They set up a meeting at her house to discuss these stressors in her life. S.K. revealed to Edouard her husband’s infidelities in that meeting. S.K. “was relieved that [she] could tell somebody, that he’s the pastor; that [she] could confidentially talk to him about what was going on.” They continued to meet at her house. At these ensuing meetings, they were physically intimate, and, S.K. testified, they would talk, because she “would want to talk,” and felt she “needed somebody to talk to.”
Edouard’s relationship with W.B. began in a different fashion. Some flirtatious conversation between the two of them had occurred. W.B. telephoned Edouard to set up a meeting to put an end to things. When she asked in the course of that telephone conversation whether it was “normal and acceptable” for Edouard to meet with women in his office, “he said yes, he counsels women at his home, and ... it was just fine” for her to meet there.
At the office meeting, Edouard asked “a lot of questions — very concerned about how I was doing, how my father is doing.” Her father had recently been diagnosed with Alzheimer’s. The questions quickly became more personal, and W.B. eventually revealed in the meeting that she had been abused physically and sexually as a child. Edouard probed that topic more deeply, she explained, as “[h]e was interested in it. He wanted to know the dynamics.” Soon thereafter, Edouard began to have a sexual relationship with W.B. This led W.B. to seek marital counseling. Edouard would ask W.B. about what the marital counselor had said, and then tell W.B. whether to follow that advice or not.
We turn finally to A.B. Edouard inquired as to how she was doing and how she was “juggling everything.” He asked if she “would like to set up a meeting with him.” Even though she testified she was not suffering from a mental disease or dysfunction at the time of their initial meeting, A.B. also testified she was taking depression and anxiety medication at the *439 time and had various stressors in her life. She agreed to meet with Edouard in his home office. She perceived this meeting to be a “counseling session, something [she] could go to that he was ... a pas-tort.]” The conversation in that initial meeting, she testified, started out with “typical conversation.” Edouard asked gradually more probing questions, such as, “Do you feel stressed? Do you feel upset?” A.B. testified she was “very open with him” because “it [was] all supposed to be confidential,” so she “definitely shared with him the ins and outs of how it felt to be a mom and taking care of everyone.” As the conversation progressed, Edouard began to ask even more “dig-deep kind of questions,” inquiring, for example, about her relationship with her husband. Many of the questions made her feel uncomfortable, and she left the meeting “[c]onfused and very nervous.”
A.B. immediately called her sister, and reported, “I just got done with a counseling session with Pastor Edouard, and I — it went fine, but at the end, it was just odd.” Edouard continued to have meetings with A.B., and Edouard continued to ask her probing questions, often of a kind that made her feel uncomfortable. She described these questions as “intellectual” and “constantly-thinking questions that no one has ever asked me before.” A.B. characterized Edouard’s inquiries as “digging and finding out [her] vulnerabilities.” By this time, they were having sexual relations.
We find sufficient evidence to sustain Edouard’s convictions on all of the sexual exploitation counts. There is substantial evidence that he counseled each of the four women for an “emotional ... or social dysfunction, including an intrapersonal or interpersonal dysfunction.” See Iowa Code § 709.15(l)(d). As required by the district court’s jury instructions, this went beyond an “informal exchange of advice,” or “the giving of general spiritual advice or guidance from a clergy member to congregants.” [4] There is substantial evidence that a relationship was established between Edouard and each victim, at least initially, “for the purpose of addressing particular mental, intrapersonal or interpersonal dysfunctions.” To some extent, as in Allen, it appears sexual contact was part of Edouard’s program of pseudothera-py and treatment for his victims.[5]
D. Production of Mental Health Records. The four victims in this case participated in group therapy sessions after Edouard’s conduct came to light and he resigned from the church. V.B., S.K., and A.B. voluntarily agreed to waive any privilege -with respect to the records of these sessions. W.B. did not. Nonetheless, the district court ordered their production and they are not at issue on appeal.
W.B. also went through marital counseling while she was still seeing Edouard. She underwent additional counseling thereafter. She declined to waive the privilege as to those records. Edouard argues the records were relevant to show that W.B. was not suffering from “a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction,” Iowa Code § 709.15(l)(d), and therefore Edouard could not have been providing mental health services to her. See id.
The district court denied Edouard’s motion for access to the records and found he *440 had not met the burden under Cashen or Iowa Code section 622.10 to show at least a reasonable probability that these records “contain something that may be exculpatory.” See Iowa Code § 622.10; Cashen, 789 N.W.2d at 405. Edouard argues the district court improperly applied Cashen, and as a result, prejudice is presumed. He insists the denial of the access to the records violated his right to due process.
This court developed the Cashen protocol to determine whether a criminal defendant should have access to the mental health records of a victim. See Cashen, 789 N.W.2d at 408-10 (requiring a defendant to make a good faith showing that there is a “reasonable basis to believe the records are likely to contain exculpatory evidence tending to create a reasonable doubt as to the defendant’s guilt”); see also Thompson, 836 N.W.2d at 479-80 (discussing the Cashen protocol). However, a 2011 change in the Iowa Code superseded Cashen by providing a defendant seeking to obtain privileged records must:
demonstrate] in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case.
Iowa Code § 622.10(4)(a )(2)(a); see 2011 Iowa Acts ch. 8, § 2 (amending the statute); Thompson, 836 N.W.2d at 481, 490 (recognizing the amendment as a “reaction to Cashen” and upholding the amended statute as constitutional on its face). This amendment was in effect at the time of the hearing on the motion for subpoena, and thus controls in this case.
We discussed section 622.10(4) (a) (2)(a) in length in Neiderbach, 837 N.W.2d at 195-98. In Neiderbach, the defendant and codefendant were charged with child endangerment after the victim, their son, suffered a number of injuries, including permanent brain damage, over a three-week period shortly after his birth. Id. at 187-89. We concluded the district court erred by failing to conduct an in camera inspection of the codefendant’s medical records sought by Neiderbach under section 622.10(4)(a )(2)(a). Id. at 197. We noted the codefendant’s credibility was “a central issue” in the case and Neiderbach’s “defense strategy included raising reasonable doubt whether certain injuries may have been inflicted by [the codefendant] instead of him.” Id. Because the codefen-dant gave inconsistent statements, concocted a false story with Neiderbach to present to hospital staff, and behaved strangely in jail, we concluded the defendant “ ‘demonstrate^] in good faith a reasonable probability that the information sought ... is likely to contain exculpatory evidence ... and for which there is a compelling need for [the defendant] to present a defense’ within the meaning of section 622.10(4)(a )(2)(a).” Id. at 197 (quoting Iowa Code § 622.10(4)(a. )(2)(a)). We observed that the records of her mental health counselor “may very well have enabled defense counsel to more effectively cross-examine her at trial or assisted counsel’s preparation for her deposition.” Id. at 198.
However, despite our conclusion, we declined to reverse Neiderbach’s conviction outright. Id. Rather, we entered the following order:
Accordingly, we reverse the district court’s ruling denying [Neiderbach]’s motion for an in camera review of [the codefendant]’s mental health records and remand the case for the district court to conduct that review pursuant to section 622.10(4)(a )(2). If the district court finds no exculpatory evidence on that review, [Neiderbach]’s remaining convictions shall remain affirmed. If ex *441 culpatory evidence is found, the district court shall proceed as directed in section 622.10(4)(a)(2)(c) and (d) and determine whether [Neiderbach] is entitled to a new trial.

Id.

We recognize that this case presents a different set of facts than Neiderbach. Rather than seeking the records of a testifying codefendant, here Edouard seeks the counseling records of one of his alleged victims. Even after the legislature’s adoption of section 622.10, we reiterated our recognition of the “importance of maintaining confidentiality in mental health treatment.” Thompson, 836 N.W.2d at 488. In reviewing the constitutionality of the legislature’s policy choices contained in section 662.10(4), we stressed a “victim-patient’s constitutional right to privacy in her mental health records” was protected, in part, by the legislature’s choice “to have a neutral judge review the victim’s private records, rather than the advocate for the alleged abuser.” Id. at 487. We determined this protection, along with others contained in the statute, was a constitutional way “to balance the competing rights of criminal defendants and their victims.” Id. at 490.
Having said that, we believe a similar approach to the one we took in Neiderbach is warranted in this case. W.B. testified that during her sexual relationship with Edouard, she was also going through marital counseling at a counseling center. Edouard’s counsel used this fact to close her cross-examination of W.B. with a flourish:
Q. You and your husband don’t go to marital counseling with [Edouard]? A. Correct.
Q. You go to Pine Rest? A. Right.
Q. And Pine Rest is a counseling center? A. Yes.
Q. And that’s what they do there, is they have Christian counselors, right? A. Yes.
Q. So you never do actually go to Mr. Edouard for your counseling? A. Right.
The defense did not ask W.B. about the content of her marital counseling sessions. However, needing to rehabilitate W.B., the State then got her to testify on redirect that Edouard went over the same matters with her that her marital counselor had covered with her:
Q. After you would have a session at Pine Rest with the marriage counselor, would you tell Pastor Edouard what the counseling session was about? A. Yes.
Q. Would he ask you? A. Yes.
Q. Would he ask you lots of questions about the counseling session? A. Yes.
Q. And would you answer his questions? A. Yes.
Q. What kind of questions would he ask about a counseling session at Pine Rest that you attended with your husband? A. He wanted to know all the dynamics. He wanted to know what we said, what she said.
Q. Who is “she”? A. The counselor.
Q. And would you tell him specifics about what she said and what the two of you talked about with her? A. Yes.
Q. Would you share with him — you said “the dynamics.” What do you mean by that? A. What did I say?
Q. You said something about “the dynamics” of the session, he would ask about the dynamics. A. What was said.
Q. And would you — if the counselor gave you and your husband a piece of advice that was supposed to help you, did he ask you whether the counselor gave you advice? A. Yes.
Q. And would you tell him? A. Yes.
*442 Q. Would he express an opinion on whether- he agreed with that? A. Yes.
Q. Would he advise you whether to follow the advice of that counselor at Pine Rest or not? A. Yes.
Q. Could you explain that? Give us an example. A. There was oftentimes he did not like the advice that she gave, and he would tell me a different way to do it or “Just don’t listen to her.”
Q. And then would you do it her way or his way? A. His way.
This sequence involving two talented trial lawyers ■ demonstrates that Edouard’s quest for W.B.’s mental health records was clearly more than a fishing expedition. Cf. Thompson, 886 N.W.2d at 490 (noting the absence of “a nexus between the issues at trial and the mental health treatment received by [the victim]”). Nevertheless, the State argues the records were not likely to contain exculpatory information for two reasons. First, the State points out that W.B. consistently admitted her mental health was fine in 2007 before she started seeing Edouard. Thus, it contends Edouard did not need those records to establish the absence of a dysfunction. Second, the State urges that the existence or lack of a diagnosis is irrelevant to whether Edouard provided “mental health services.”
We disagree with the State. Although W.B. admitted her mental health was fine before her sexual relationship with Edouard began, she described having personal difficulties thereafter. Counseling records for the time period when W.B. was seeing Edouard and shortly thereafter would be potentially relevant to the extent they touch upon the nature and extent of those problems. And while the State insists that a diagnosed dysfunction is not a required element of the crime, the lack of diagnosis for such a dysfunction would seem to us an appropriate subject for jury argument. In its closing, the State argued with respect to W.B.:
What is a mental health service? “.... The providing of treatment, assessment, or counseling to another person for a cognitive, behavioral, emotional, mental or social dysfunction, including an intrapersonal or interpersonal dysfunction.”
In other words, she’s having personal problems, and [Edouard’s] counseling her for those problems. That’s what all that fancy language is.
In short, the State argued to the jury that dysfunction means nothing more than “personal problems.” But a defendant should have latitude to argue it means something more than that. Perhaps W.B.’s counseling records would have assisted Edouard in fashioning an argument that W.B. was not suffering from a dysfunction during any relevant time period.
In addition to showing a reasonable probability the records might likely contain exculpatory information necessary to his defense, Edouard also had to show the information “is not available from any other source.” See Iowa Code § 622.10(4)(a )(2)(a). We previously pointed out in Neiderhach that, under certain circumstances, information is not “available” from another source just because testimony can be obtained from the patient or client. 837 N.W.2d at 197-98. We believe this is another one of those situations. Information in the counseling records could have significantly undermined W.B.’s testimony. We do not know.
Therefore, we reverse the district court’s ruling that denied Edouard’s request for in camera review of W.B.’s counseling records. We emphasize the limits of this decision. The crime charged requires the State to show the defendant counseled W.B. for a dysfunction, and the *443 record shows W.B. was receiving outside counseling at the same time and shortly thereafter. Also, as in Neiderbach, if the district court finds no exculpatory evidence, Edouard’s convictions will stand affirmed. See 837 N.W.2d at 198 & n. 3. If exculpatory evidence is found, the district court would then determine if a new trial is required on the Iowa Code section 709.15(2)(c) count relating to W.B. and the section 709.15(2)(a) pattern or practice count.
E. Constitutional Challenges. Edouard raises two constitutional challenges as a part of his appeal. First, he contends that section 709.15(2), as applied to him, unconstitutionally burdens his fundamental right to enter into sexual- relationships. He maintains that- section 709.15(2) “creates a per se ban on all sexual relations between certain categories of individuals regardless of the existence or nonexistence of consent,” and that “[i]m-plieit in the jury’s verdict finding Edouard not guilty of sexual abuse in the third degree is the conclusion that his sexual relationships with all four women were consensual.” In Edouard’s view, section 709.15(2) is not narrowly tailored to address a compelling interest using the least restrictive means possible.
Edouard refers to the Due Process Clauses of both the United States Constitution and the Iowa Constitution in his brief. However, he does not advance a separate analysis under the Iowa Constitution. For this reason, we will undertake the same analysis for both claims. See State v. Kennedy, 846 N.W.2d 517, 522 (Iowa 2014) (stating that “[w]e jealously protect this court’s authority to follow an independent approach under our state constitution for provisions of the Iowa Constitution that are the same or nearly identical to provisions in the United States Constitution” but choosing not to interpret the Iowa Constitution any differently from the United States Constitution where the defendant had not proposed a specific test under the Iowa Constitution (internal quotation marks omitted)).
In Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), the United States Supreme Court overturned the convictions of two male adults for engaging in consensual sexual conduct. The Court found the defendants were “free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution.” Id. at 564, 123 S.Ct. at 2476, 156 L.Ed.2d at 516. Edouard cites us to Lawrence, but it is important to note that Lawrence “does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.” Id. at 578, 123 S.Ct. at 2484,156 L.Ed.2d at 525. By contrast, Lawrence involved “two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.” Id.
In State v. Musser, we rejected a constitutional privacy challenge to Iowa’s statute making it a felony for a person knowing he or she was HIV positive to engage in intimate conduct with another person who was not aware of that status. See 721 N.W.2d 734, 748 (Iowa 2006). We found that Lawrence was “readily distinguishable” because there was “not ‘full and mutual consent’ ” where one sexual partner was unaware of the other’s infected status. Id. (quoting Lawrence, 539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525). “Consent in the absence of such knowledge is certainly not a full and knowing consent as was present in Lawrence.” Id. We also observed that “the sexual partner of an infected person is at serious risk of injury *444 and even death from the prohibited sexual contact.” Id.
To some extent, the distinctions we recognized in Musser also exist here. Based upon their testimony, the relationships between Edouard ánd each of the four women did not involve full and mutual consent. In each case, Edouard used— misused — his position of authority as a counselor to exploit the vulnerabilities of his victim. The relationships were of a kind where “consent might not easily be refused.” Lawrence, 539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525.
And the women suffered harm. Following her experience with Edouard, A.B. was “scared” and “struggling.” She later wrote the word “Freedom” in her husband’s notebook because “[t]he longer you’re out of [Edouard’s] grip, the more freedom you get.” V.B. felt it “was hard to keep going” after her experience with Edouard and was afraid of “[l]osing everything” because she felt no one would believe her over him due to his reputation in the congregation. S.K. was “trapped,” and felt that Edouard was “a ball and chain.” After Edouard was exposed, W.B. “couldn’t eat” and was “losing weight.”
Edouard is not the first person to assert that any sexual exploitation laws that criminalize consensual sexual relations between adults are unconstitutional. Similar arguments have been raised, generally without success, in other jurisdictions. For the most part, the courts have reasoned that the statutes do not implicate fundamental rights and are not controlled by Lawrence because the relationship is imbalanced and not fully consensual. See, e.g., State v. Freitag, 212 Ariz. 269, 130 P.3d 544, 545-46 (Ariz.Ct.App.2006) (rejecting an argument that prostitution was protected by a “fundamental constitutional right to engage in adult consensual sexual conduct” as recognized in Lawrence)-, Talbert v.
State, 367 Ark. 262, 239 S.W.3d 504, 511-13 (2006) (upholding a statute that prohibits a member of the clergy from using his or her position of trust and authority to engage in sexual activity with a victim and finding Lawrence distinguishable); State v. Edwards, 48 Kan.App.2d 264, 288 P.3d 494, 498-503 (2012) (finding a statute that prohibited a teacher from engaging in sexual activity with an eighteen-year-old student was subject to a rational basis review, noting, “[w]hen read in its entirety, it is clear that the intent of this statute is to prohibit sexual conduct of certain persons who have authority over other persons where the ability to freely consent is questionable”); State v. Lowe, 112 Ohio St.3d 507, 861 N.E.2d 512, 515-18 (2007) (determining that Lawrence did not apply and the defendant did not have a fundamental right to engage in sexual intercourse with his consenting adult stepdaughter); State v. Green, 989 N.E.2d 1088, 1089-90 (Ohio Ct.App.2013) (finding no fundamental right to engage in consensual sexual activity for hire); Ex parte Morales, 212 S.W.3d 483, 490-98 (Tex.Ct.App.2006) (finding a statute that criminalized sexual conduct between a dormitory residential advisor and a student over the age of majority should be reviewed under a rational basis standard, which it met); see also Flaskamp v. Dearborn Pub. Schs., 385 F.3d 935, 943 (6th Cir.2004) (indicating that a ban on relationships between teachers and their students for one year after graduation would not be a direct and substantial burden on the right to intimate association and would be subject to a rational basis review). But see Paschal v. State, 388 S.W.3d 429, 434-37 (Ark.2012) (finding a statute that criminalized sexual conduct between a teacher and an eighteen-year-old student infringed upon a fundamental right to privacy under the Arkansas Constitution).
*445 In State v. Hollenbeck, the New Hampshire Supreme Court confronted a psychologist’s constitutional challenge to a New Hampshire law that made it a crime for a therapist to have sexual relations with a patient within one year of the termination of the therapeutic relationship in a manner which is not professionally recognized as ethical. 164 N.H. 154, 53 A.3d 591, 593 (2012). The court found that “the kind of sexual relationship alleged here is not included in the constitutional right Lawrence recognized.” Id. at 598. Rather, the relationship between a therapist and a former client is the kind of relationship “ ‘where consent might not easily be refused.’ ” Id. (quoting Lawrence, 539 U.S. at 578, 123 5.Ct. at 2484, 156 L.Ed.2d at 525). Accordingly, the court applied a rational basis standard of review and upheld the statute as serving “legitimate governmental interests in protecting those who are vulnerable to exploitation from being exploited ... and in maintaining the integrity of the mental health profession.” Id. at 598-99.
We find Hollenbeck persuasive here. The statute as applied to this ease does not invade a fundamental right. There is no fundamental right to engage in sexual relations in circumstances where one partner is in a position of power or authority over another. There was ample evidence that Edouard occupied a position of power and authority over each of his four victims. We would leave open the question whether a substantive due process challenge to Iowa Code section 709.15 could be successfully brought in other factual contexts. We also emphasize, as we stated earlier, that Edouard has not raised a vagueness or overbreadth challenge to section 709.15 in this case.
Edouard’s other argument is that section 709.15, as applied to members of the clergy, violates the Establishment Clause of the United States and Iowa Constitutions. See U.S. Const, amend. I; Iowa Const, art. I, § 3; Kliebenstein v. Iowa Conference of United Methodist Church, 663 N.W.2d 404, 406 (Iowa 2003) (noting that “ordinarily the courts have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies,” but “do have jurisdiction as to civil, contract, and property rights which are involved in or arise from a church controversy” (internal quotation marks omitted)).
In State v. Bussmann, the Minnesota Supreme Court divided equally on the question whether Minnesota’s clergy sexual conduct statute — which applies only to members of the clergy — facially violated the Establishment Clause of the United States and Minnesota Constitutions. See generally 741 N.W.2d 79 (Minn.2007).[6] A majority of the court found an Establishment Clause violation as applied to the facts of the defendant’s trial because “[t]he state relied heavily on religious expert testimony to prove its case and the court allowed the jury to hear discussion that intertwined religious doctrine with state law.” Id. at 92. The court elaborated, “Virtually all of this testimony lacked foundation to connect it to any secular standard, was irrelevant to any secular standard, was inadmissible hearsay evidence, and was highly prejudicial.” Id. at 93. The court concluded:
[T]he district court allowed the state to introduce extensive evidence regarding *446 the Catholic Church’s doctrine on the religious power of priests over parishioners; the Church’s official policy on counseling and pastoral care; the Church’s concerns about priest sexual misconduct; and the Church’s official investigation and findings regarding Bussmann’s behavior. Through the admission of this evidence, the court allowed the religious doctrine of the Catholic Church to become entangled with the criteria set out in the clergy sexual conduct statute for determining the criminality of Bussmann’s conduct. The jury’s verdict was based on this evidence, and was unavoidably entangled with the religious doctrine introduced into evidence by the state.
Id. at 94.
Subsequently, in State v. Wenthe, the Minnesota Supreme Court held that Minnesota’s clergy sexual conduct statute did not facially violate the Establishment Clause, because it was “part of a larger statutory scheme that regulates the behavior of those involved in ... relationships for which the Legislature has determined there is a power imbalance between the parties” and “applies neutral principles of law and regulates only secular aspects of clergy-parishioner relationships.” 839 N.W.2d 83, 88-91 (Minn.2013).
The court also upheld the constitutionality statute as applied to the facts of the case because “the State did not attempt to shift the jury’s focus away from the secular elements in the clergy-sexual-conduct statute and onto religious doctrine.” Id. at 92. In Wenthe, unlike Bussmann, there was no testimony by a Catholic priest and a Catholic counselor about the religious power of priests, only a minimal amount of evidence admitted by the state related to the policies of the Catholic Church on pastoral care, and the state’s evidence about the church’s response to the sexual relationship was factually relevant to the case. Wenthe, 839 N.W.2d at 93-95.
We do not find section 709.15 violates the Establishment Clause as applied to clergy. As the State points out, the statute, unlike Minnesota’s, is essentially neutral. It applies to all persons who provide or purport to provide mental health services. Iowa Code § 709.15(l)(<z). Edouard notes the State’s emphasis during trial on the victims’ faith and on Edouard’s status as the victims’ pastor. But these were relevant evidentia-ry considerations because they showed why the victims would allow Edouard to have sex with them even as they were receiving mental health services from him. Edouard also overlooks the fact the case, as tried, included three counts of sexual abuse. Evidence regarding Edouard’s status and the victims’ faith was particularly relevant to the sexual abuse counts, because it tended to explain why three of the four victims would later be willing to have sex with a person who had initially forced them to have sex with him.[7] Edouard, of course, does not contend that Iowa’s sexual abuse statute violates the Establishment Clause. See Iowa Code § 709.1.
As in Wenthe, while the trial certainly did not veer away from the religious setting in which the defendant’s conduct took place, it did not dwell on religious doctrine either. The defendant, not the State, sought to introduce evidence on standards of pastoral care. In addition to the victims themselves, the only witnesses called by the State were a psychologist as a rebuttal witness and two church elders. The elders *447 testified primarily as fact witnesses to admissions and statements made in meetings after Edouard’s conduct began to come to light. In the course of cross-examining the first elder, Edouard’s counsel delved to some extent into the Covenant Reformed Church’s mission. By doing so, Edouard’s counsel was able to get this elder to admit, helpfully, that Edouard was expected to provide spiritual guidance— but not mental health services — to parishioners.
Notably, when the second elder was asked about his concerns regarding his congregation and its members, and Edouard objected on the basis of relevance, the district court sustained the objection. The court explained:
Counsel, it seems to me that the discussions which took place between Mr. Edouard and members of the church are certainly relevant to the extent that they are his statements, but I’m concerned that the actions of the church and the positions of the church really don’t have a bearing on the legal issues that are before the court.
Whether the church in its hierarchy and its functioning made a determination that Pastor Edouard had sinned, that he should be removed in some manner from his duties with the church, or that the church should in some manner sanction him, I have trouble believing that that is relevant to the issues in this case for this jury; and that the inclination would be for the jury to in' some manner, essentially, be- assisted by the findings of the church,-' which would be inappropriate in this case.
This incident illustrates the district court’s sensitivity to the potential crossover between church canons and secular laws. It demonstrates the court enforced proper boundaries. While we would not foreclose an as-applied challenge in a- future casé, wé are not persuaded by Edouard’s Establishment Clause arguments here.
F. Other Evidentiary Rulings. Before trial, the State filed a motion in limine seeking to exclude any reference to evidence that Edouard’s home in Pella was vandalized or that his family had been harassed after his sexual encounters with his parishioners came to light. This included evidence of a brick being thrown through his window and that his home and personal belongings were posted for sale on Craigslist, along with other evidence of harassment and vandalism.
In response to the motion, Edouard argued the evidence was relevant to explain why he left the Pella community after his conduct came to light. The court concluded:
In a general sense, the court believes that the evidence regarding allegations of a brick being thrown through a window, postings on Craigslist regarding the defendant’s property, or reports of vandalism or harassment at the defendant’s home in 2010 and 2011 is not relevant, at least of any apparent nature at this point.
It appears to the court that such evidence, if admitted, would merely confuse the jury, would distract the jurors from the issues in the case which they must decide, and- that ■ it has little, if any, probative value in this case. If, in fact,it becomes apparent that there is a basis for admitting the evidence, the court certainly is willing to take another look at that, if raised by the defendant prior to the admission of the evidence.
The defendant presented his evidence in an offer of proof at trial. Edouard testified that, before the four women actually went to the police, a rock was thrown through his sons’ bedroom window while *448 they were sleeping. Additionally, spikes were placed behind the wheels of his vehicles in his driveway, his home and personal belongings were listed for sale on Craig-slist along with his home telephone number, pizzas he had not ordered were delivered to his home, and the husband of one of the victims followed him “on a couple of occasions.”
The questioning in the offer of proof ended as follows:
Q. Did all of these acts influence your decision to move to Michigan when you did? A. Yes. Absolutely.
Q. Why? A. Well, evidently we were not safe there. But also, it became clear to me that my presence probably was a lightning rod. I didn’t want my children to be subjected to that kind of harassment. I wanted for there to be healing as soon as possible, and I thought my absence would be the first building block toward that.
Edouard maintains this information is relevant as the “threats and fear explain Edouard’s hesitancy in answering questions about the allegations to the church elders, his general withdrawal from his friendships within the church, and his abrupt move out of Iowa.” The State, however, argues the jury did not need this explanation.
We agree with the State. Edouard had admittedly engaged in sexual relations with four married women from his congregation. As he explained to the jury, “[T]he sins for which I resigned warranted my deposition as a minister.” He testified that he was “censured” and “did not contest it.” All this was scandalous enough for the jury to understand why he left town. A jury would not conclude that Edouard believed he was guilty of a crime just because he moved to Michigan. We see no abuse of discretion.
Edouard also attempted to offer evidence that one of the victims, V.B., had an extramarital affair with another man, R.M., after having sexual relations with Edouard and before making any allegations against Edouard. Edouard indicated that V.B. told him about the details of this sexual relationship with R.M. and asked him to lie about it to her husband. Edouard argued the information was relevant for three reasons: (1) the fact she shared this type of information with Edouard about the second affair shows their relationship was one of friendship, not counseling; (2) the nature of the relationship V.B. had with R.M. was very similar to the relationship she had with Edouard, and she later lied to her husband about R.M. so it “is exactly the same kind of lie we believe she would be telling about Mr. Edouard”; and (8) the fact she gave $2000 to R.M. undermines the suggestion that the monetary gifts she gave to Edouard were as a result of any type of power relationship between the two.
The court determined the evidence of the affair was “squarely within the provisions of the rape shield law.” It concluded evidence of the affair or money gift amounted to an argument that V.B. had “the same type of relationship the defendant claims” and “would be no different than a defendant claiming that the alleged victim had engaged in consensual sex with 15 other individuals and that that should be admitted as proof that the relationship with the defendant was consensual, which is precisely what is precluded by the rule.”
Iowa Rule of Evidence 5.412(a) states, “[I]n a criminal case in which a person is accused of sexual abuse, reputation or opinion evidence of the past sexual behavior of an alleged victim of such sexual abuse is not admissible.” The purpose of this rule “is to protect the victim’s privacy, encourage the reporting and prosecution of *449 sex offenses, and prevent the parties from delving into distractive, irrelevant matters.” State v. Alberts, 722 N.W.2d 402, 409 (Iowa 2006). However, “evidence of a victim’s past sexual behavior other than reputation or opinion evidence” is admissible if it is “constitutionally required to be admitted.” Iowa R. Evid. 5.412(6 )(1). Additionally, the rule contains a balancing test, identical to that contained in rule 5.403, for the admission of evidence under 5.412(6). Id. r. 5.412(c )(3) (“If the court determines on the basis of the hearing described in rule 5.412(c )(2) that the evidence which the accused seeks to offer is relevant and the probative value of such evidence outweighs the danger of unfair prejudice, such evidence shall be admissible in the trial to the extent an order made by the court specifies evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined”).
We have held that even if evidence of specific instances of sexual conduct is relevant, the defendant has no constitutional right to introduce that evidence when its probative value is outweighed by its prejudicial effect. See State v. Mitchell, 568 N.W.2d 493, 498-99 (Iowa 1997) (refusing to allow evidence of a victim’s sexually transmitted diseases which the defendant did not contract because “the probative value of the evidence was substantially outweighed by the danger of unfair prejudice” and stating, “relevant evidence is not constitutionally required to be admitted if the prejudicial effect of the evidence outweighs the probative value”); State v. Jones, 490 N.W.2d 787, 791 (Iowa 1992) (noting there is no constitutional requirement to admit evidence of -victim’s past sexual history where it is “more prejudicial than probative for the purposes urged”).
In this case, it is highly questionable whether the evidence was even relevant. The argument that the disclosure of private information about an individual’s sexual liaisons with others is indicative of a friendship rather than a counseling relationship does not seem logical. It is certainly not unheard of for an individual to discuss an extramarital affair with a counselor or to request one’s counselor to keep that information secret.
Additionally, the fact that V.B. lied to her husband about an affair with another man would add little, if anything, of value to Edouard’s defense. V.B. admittedly lied to her husband about the money she gave Edouard, and of course she kept the entire sexual relationship with Edouard secret from her husband.
Finally, V.B.’s willingness to give a far more modest ($2000 as opposed to $70,000) financial gift to another person with whom she had a later affair would not make it much less likely that her relationship with Edouard was an uneven one in which he acted as her counselor.
The district court in this case correctly concluded the evidence of V.B.’s alleged affair fell within the protection of the rape shield law, rule 5.412. The court noted the testimony had a clear prejudicial effect: It would tend to suggest that because V.B. had a consensual affair with another individual, she therefore had a consensual affair with Edouard. We find no error in the district court’s ruling.
G. Restitution. Finally, Edouard claims the district court erred with respect to the restitution it awarded against him. Each of the women and two of their spouses received payments from the crime victim compensation program (CVCP). See Iowa Code § 915.86.[8] The *450 State sought to charge those payments against Edouard. See id. § 910.2(1). At the restitution hearing, the State called to the stand the restitution subrogation coordinator from the crime victim assistance division. The State also presented six exhibits — the crime victim assistance division’s files for all four victims and two of the victims’ husbands. Following this hearing, the court ordered that the State’s CVCP could recoup a total of $12,956.74 in restitution from Edouard.
In State v. Jenkins, we held that amounts paid to victims by the CVCP may not be automatically charged back to the defendant. 788 N.W.2d 640, 645-47 (Iowa 2010). Rather, there may be a review by the district court to determine whether the statutory causation requirements of Iowa Code section 915.86 have been met. Id. at 647. The district court conducted such a review here but Edouard challenges its sufficiency.
Specifically, Edouard claims the State’s witness had no firsthand knowledge that the treatment received by the victims could be linked to his criminal conduct. He maintains a causal connection cannot be shown simply by calling a witness who brings in paperwork completed by others.
The State’s witness testified to the manner in which requests for compensation are approved by the crime victim assistance division:
In every claim that is filed with our office, the victim signs a release of information, and they put on the release who the providers are that they want assistance with for payment. And also on the application there is a place to mark what benefits they’re seeking. So based on that information, we send out ... request forms to those providers and they complete them. And we also ask for itemized statements and the medical records, and then the compensation specialist reviews that and determines whether or not it is crime related.
And ... then we have a quality control system also that reviews that file to make sure that everything was done right.
She further testified that each mental health or medical provider also fills out a verification form regarding the treatments that indicates whether the service was related to the crime.
In this case, the providers in question had attested in writing that all the treatments were related to the crime. Each exhibit contained a form signed by the treatment provider that verified the treatments in question were “provided as a direct result of the crime.” The coordinator also confirmed this in her testimony. Edouard did not attempt to present any evidence of his own but did vigorously cross-examine the coordinator.
We do not believe restitution proceedings are subject to strict rules of evidence. See Iowa R. Evid. 5.1101(c)(4) (stating the rules of evidence do not apply in sentencing proceedings). In the review of a restitution order, “ ‘we determine whether the court’s findings lack substantial evidentiary support, or whether the court has not properly applied the law.’ ” Hagen, 840 N.W.2d at 144 (quoting State v. Bonstetter, 637 N.W.2d 161, 165 (Iowa 2001)). As the district court explained,
[t]he court has reviewed the mental health services provided to the victims, and to the secondary victims, to the extent the notes and records are avail *451 able, and finds that the State has established the propriety of assessing those mental health costs as part of the restitution herein.
We uphold as supported by substantial evidence the district court’s conclusion that the mental health care costs charged to Edouard were incurred “as a direct result” of Edouard’s crimes. See Iowa Code § 915.86(1); see also id. § 910.2(1) (requiring sentencing courts to order offenders to make restitution “to the victims of the offender’s criminal activities”).
Next, Edouard contests the travel expenses granted for attendance at trial.[9] Edouard maintains these were costs of prosecution that should not have been charged against him. However, Iowa Code section 915.86(15) makes clear that victims can be compensated for “[r]easonable expenses incurred by the victim [or] secondary victim,” including “for transportation to medical, counseling, ... or criminal justice proceedings, not to exceed one thousand dollars per person.” The district court’s award was therefore proper.
Edouard’s reliance on State v. Knudsen is misplaced. See 746 N.W.2d 608, 610 (Iowa Ct.App.2008). True, the court of appeals there noted that prosecution costs generally cannot be included in a restitution order. See id. But the difference here is the State is seeking reimbursement for crime victim assistance as opposed to direct restitution. See Iowa Code § 910.2(1). The crime victim assistance statute specifically authorizes compensation to victims for transportation expenses under the circumstances presented here. See id. § 915.86(15). The State produced evidence to support the victims’ claims of trial attendance.
Edouard’s third argument is that the victims were not eligible for compensá-tion under Iowa Code section 915.87(2)(a) because they consented to their relationships with Edouard. That subsection provides that victim compensation “shall not be made when the bodily injury or death for which a benefit is sought was caused by ... [c]onsent, provocation, or incitement by the victim.” Id. § 915.87(2)(a). The trial court correctly found this provision did not apply. It would miss the entire point of the counselor-therapist sexual exploitation law to hold that these victims’ mental health injuries were caused by their “consent,” as opposed to the conduct of the defendant, which we have described in detail above.
Finally, Edouard urges that the trial court erroneously overruled an objection that the victims had failed to comply with certain limitations and reporting requirements contained in Iowa Code sections 915.84(1) and (2). The first subsection requires a victim seeking compensation to apply within two years after “the date of the crime” or “the discovery of the crime,” and the second subsection indicates an individual is not eligible for compensation “unless the crime was reported to the local police department or county sheriff department within seventy-two hours of its occurrence” or “within seventy-two hours of the time a report can reasonably be made” if it cannot be reasonably reported within seventy-two hours of its occurrence. Id. § 915.84(1) — (2). However, both subsections also indicate the department of justice may waive the time limitation and reporting requirements “if good cause is shown.” Id.
Edouard points out that some of the victims used the date of their police reports, January 2011, as the crime date, despite the fact that much of the sexual abuse and exploitation occurred years be *452 fore. He argues the crimes were not reported within seventy-two hours of their commission and reimbursement was not sought within two years of the crime. Therefore, unless good cause was shown, the victims and secondary victims (i.e., the spouses) were not eligible for compensation under the statute.
The State argues, in effect, that Edouard has no standing to raise a claim of untimeliness because “the decision is between the agency and the applicant” whether to award compensation from the CVCP. We disagree. We think the rationale of Jenkins holds otherwise. Regardless of whether the State has paid some amount to a victim of crime, in order to recover that same amount from the defendant as restitution it must show it complied with the underlying law. Otherwise stated, defendants should be able “to challenge erroneous CVCP payments.” Jenkins, 788 N.W.2d at 645.
The State’s witness did testify that a timeliness review is regularly performed and that a memo is usually prepared if an extension of time is approved. However, the memo is “considered confidential.” The witness did not know if a memo existed in this case.
We believe this evidence is insufficient to establish the department for justice actually found good cause. Indeed, if it were deemed sufficient, no defendant would ever be able to raise a timeliness challenge. Admittedly, we have not previously held that Jenkins permits a defendant to object to a CVCP restitution award on the ground that the deadlines were not waived for good cause. Therefore, we believe the appropriate course of action is to reverse and remand to give the State the opportunity to introduce evidence that the CVCP waived any deadlines in sections 915.84(1) or (2) for good cause shown.
IV. Conclusion.
For the foregoing reasons, we conditionally affirm Edouard’s conviction and sentence under Iowa Code section 709.15(4)(a) and his conviction and sentence under section 709.15(4)(c) with respect to W.B. We affirm Edouard’s remaining convictions. We reverse the restitution award to the State. We remand for further proceedings consistent with this opinion.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.
All justices concur except APPEL, J., and CADY, C.J., who concur specially, and HECHT and WIGGINS, JJ., who concur in part and dissent in part.

. For the sake of convenience, we cite to the current version of Iowa Code section 709.15 (2013). The general assembly made nonsub-stantive changes to the relevant provisions of section 709.15 in 2013, which do not affect our analysis here. See 2013 Iowa Acts ch. 90, § 230. Prior to those 2013 changes, the legislature had last amended section 709.15 in 2004. See Iowa Code § 709.15.

. Three of the victims testified that the first time they had sexual relations with Edouard he forced them to do so. Because Edouard was acquitted of the sexual abuse charges, we will not include further discussion of that testimony herein.

. In his brief, Edouard concedes this is not the only dictionary definition of "counseling.”

. Instruction 25, which we have upheld, is the law of the case for sufficiency-of-evidence purposes. See, e.g., State v. Merrett, 842 N.W.2d 266, 275 (Iowa 2014).

. According to V.B., Edouard advised her that she had “all this sexual energy that needed to be released, and he had to be there to protect me.”

. Minnesota's statute makes it a crime for anyone who "is or purports to be a member of the clergy” to have sexual intercourse with another person "during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private.” Minn.Stat. § 609.344 subd. 1(Z )(ii) (West, Westlaw current through 2014 Reg. Sess.).

. Edouard’s counsel attacked the sexual abuse charges during closing argument on this very ground.

. Under certain circumstances, spouses can be eligible to receive victim compensation as *450 "secondary victims,” such as for mental health care and transportation. See Iowa Code §§ 915.80(5), .86(12), (15).

. As noted above, the trial location was changed from Marion County, where the victims resided, to Dallas County.